# United States Court of Appeals

## For the First Circuit

No. 05-2391

GEN TOTA,

Petitioner,

v.

ALBERTO R. GONZÁLES,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, <u>Chief Judge</u>,
Torruella and Howard, <u>Circuit Judges</u>.

<u>Daniel F. Cashman</u>, with whom <u>Cashman & Lovely, P.C.</u> and <u>Susanna L. Shafer</u>, on brief for petitioner.
<u>Michael P. Sady</u>, Assistant United States Attorney, with whom <u>Michael J. Sullivan</u>, United States Attorney, on brief for respondent.

August 14, 2006

**TORRUELLA**, **Circuit Judge**. Petitioner Gen Tota ("Tota") petitions for review of the Board of Immigration Appeals' ("BIA") summary affirmance of an Immigration Judge's ("IJ") denial of his applications for asylum and withholding of removal.[1]  We affirm.

## I.  Background

Tota is a native and citizen of Albania who entered the United States on April 6, 2000 without a valid entry document.  On December 13, 2000, Tota filed an I-589 Application seeking asylum and withholding of removal.  On January 31, 2001, the Immigration and Naturalization Service ("INS")[2] served Tota with a Notice to Appear charging that he was removable under § 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States who has been neither admitted nor paroled.  On March 13, 2001, Tota admitted the factual allegations against him and conceded removability.

---

[1]  Tota also claims that the IJ erroneously denied protection under the Convention Against Torture.  He did not raise this claim below, however, and we therefore deem the issue waived. See Debab v. INS, 163 F.3d 21, 26 (1st Cir. 1998) (issues not raised before the IJ or BIA may not be raised upon judicial review).

[2]  In March 2003, the relevant functions of the INS were transferred into the new Department of Homeland Security and reorganized into the Bureau of Immigration and Customs Enforcement ("BICE").  For simplicity, we refer to the agency throughout this opinion as the INS.

After several preliminary hearings, Tota testified on May 12, 2004 before an IJ.[3] We draw the following facts from this testimony and documents Tota presented in support of his application.

Tota was born in Albania in 1974 and is of Muslim faith. In July 1986, under the rule of the Albanian Communist regime, Tota's father was arrested on charges of propaganda. In October of that year, Tota and his mother and brother were interned in a labor camp where they remained until they were discharged in May 1990, following the release of Tota's father by the terms of a 1989 amnesty program. Following their release, Tota and his family moved in with Tota's uncle in Tirana, the capital city of Albania.

In July 1990, Tota was arrested along with approximately thirty others outside the German Embassy in Tirana.[4] Tota was detained for two weeks without being charged, during which time he was beaten and denied access to an attorney. Less than one year later, in February 1991, he was arrested while attending a demonstration against the ruling Communist Party. Tota was

---

[3] Tota's initial hearings took place before IJs in New York City. He was granted a change of venue to Boston, closer to his new home in Salem, Massachusetts, in a January 2004 proceeding.

[4] Tota's explanation as to what he was doing at the Embassy was indiscernible in the transcript of his hearing, but he later stated that at the time of his arrest, the police arrested many individuals whom they thought were trying to leave the country.

detained for one night without being charged with a crime and was again beaten.

In 1992, the Communist Party fell and the Democratic Party ("DP") came to power in Albania. In 1995 Tota gained employment as a driver for the DP. The DP ruled until 1997, at which time the Socialist Party ("SP") took control of the government. The SP leadership consisted largely of former members of the Communist Party.

Tota continued his work as a driver for the DP until February 2000. During this time, he was beaten and his life was threatened on five separate occasions. In September 1998, police arrested Tota at his home after he attended the funeral of the prominent DP leader Azem Hajdari.[5] After his arrest, Tota was detained for approximately twenty hours without being charged, and was denied access to an attorney. During this detention, the police beat Tota, threatened to kill him, and warned that similar incidents would occur if he continued to support the DP. Upon his release, Tota did not seek medical attention but was cared for by his mother, a nurse.

The second incident took place in October 1998. After parking his car, Tota was approached by three people, including one

_____

[5] Hajdari had been assassinated earlier that month, sparking riots in which mobs attacked government buildings and leading to the arrest of hundreds. Tota denies having participated in this violence.

member of the SP, whom Tota recognized as a former member of the Communist regime. The assailants again ordered Tota not to continue working for the DP and beat him. The incident lasted ten minutes, and Tota did not seek medical attention. The third incident occurred in March 1999. Tota was again stopped and beaten by police, who ordered him to stop supporting the DP. Once again, Tota did not seek medical treatment.

In December 1999, Tota was arrested after he chauffered the leader of the DP in Tirana. Tota was taken to a police station, where he was held for approximately ten or eleven hours, during which time two people beat him, kicking and punching him, and threatened his life if he continued to work for the DP. Tota was never officially charged with a crime. Following this incident, Tota sought medical attention from a doctor who was a friend of the family. He received a shot for his pain and a few days worth of medicine.

The final incident that Tota detailed occurred in February 2000. Tota and his father were approached by masked secret service officers who beat them and threatened their lives if they did not stop supporting the DP. At one point, the officers put a handgun to Tota's head. The incident lasted twenty minutes and neither Tota nor his father sought medical treatment thereafter.

After the February incident, Tota stopped working as a driver and discontinued his "volunteer" work distributing the DP newspaper. On April 3, 2000, Tota left Albania on a ship to Italy, where he stayed for two days before using a forged Greek passport to fly to Montreal, Canada. On April 6, 2000, Tota walked across the Canadian border into the United States. He was met by a companion who drove him to Plattsburgh, New York, from where he took a bus to New York City. Tota's parents have been granted political asylum in the United Kingdom, where his younger brother's asylum application is still pending.

Tota testified that he left Albania because "life was difficult." He feared that if he returned to Albania, he would undergo episodes similar to those he experienced between 1998 and 2000 because the SP is still in power and maintains a strong police force.

The IJ denied Tota's application for asylum and withholding of removal. Though the IJ expressed some skepticism about certain aspects of Tota's testimony, he stated that Tota was "essentially credible" throughout direct examination. The IJ also found that Tota's testimony, if credible, would establish past persecution. He thus "[set] aside the issue of credibility, and assum[ed] past persecution ha[d] been established." The IJ then addressed the issue of Tota's well-founded fear of future persecution. First, the IJ found that Tota was merely a

"driver/employee" of the DP, and not a political operative. Second, the IJ found that "much has changed" in Albania, taking particular note of the 2004 United States State Department Profile of Asylum Claims and Country Conditions for Albania.[6] The IJ quoted a passage stating that "there are no indications that the Socialist Party, either through its own organization or through Government authorities, is engaged in a pattern of repression of violent behavior against its opponents." In sum, the IJ stated that it was "extremely unlikely that the Government will be waiting to persecute a minor employee of the Democratic Party who is returning after four years." The IJ concluded by finding that the government had sustained its burden of proof to show a change in country conditions beyond a preponderance of the evidence, and that "[Tota's] fear of returning to Albania cannot be said to be well-founded." Because Tota failed to meet the standard for establishing asylum, the IJ ruled that he failed to meet the narrower standard for withholding of removal, and denied this application as well.

Tota appealed to the BIA, which summarily affirmed the IJ's decision without opinion on August 22, 2005. Tota now contests the decisions of the BIA and IJ.

---

[6] United States Department of State, Bureau of Democracy, Human Rights and Labor, <u>Albania: Profile of Asylum Claims and Country Conditions</u> (2004).

## II.  Discussion

### A.  Standard of Review

Because the BIA affirmed the IJ's holding without opinion, we evaluate Tota's claims with reference to the findings of the IJ.  See Akinfolarin v. Gonzáles, 423 F.3d 39, 42 (1st Cir. 2005); Keo v. Ashcroft, 341 F.3d 57, 60 (1st Cir. 2003); 8 C.F.R. § 1003.1(e)(4).

We focus first on Tota's asylum claim.  If this fails on the merits, his withholding of removal claim fails as well, because the latter claim "places a more stringent burden of proof on an alien than does a counterpart claim for asylum."  Bocova v. Gonzáles, 412 F.3d 257, 262 (1st Cir. 2005) (citing Makhoul v. Ashcroft, 387 F.3d 75, 82 (1st Cir. 2004)) (internal citation omitted).

Tota bears the burden of establishing eligibility for asylum by demonstrating that he is a "refugee."  8 U.S.C. § 1158 (b)(1)(B)(i); 8 C.F.R. § 208.13(a).  A refugee is any person who is outside of his home country and is "unable or unwilling to return . . . because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101 (a)(42)(A).  An applicant may meet this burden by showing past persecution, which creates a legal presumption that he has a well-founded fear of future persecution.  8 C.F.R. § 208.13(b)(1). When

-8-

a petitioner has established a presumption that he has a well-founded fear of future persecution, the government can rebut this by showing by a preponderance of the evidence that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution."  8 C.F.R. § 208.13(b)(1)(i)(A).[7]

We review the IJ's factual findings under the deferential "substantial evidence" standard.  See Dhima v. Gonzáles, 416 F.3d 92, 95 (1st Cir. 2005).  We must uphold the determinations of the IJ if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole."  INS v. Elías-Zacarías, 502 U.S. 478, 481 (1992).  See also Guzmán v. INS, 327 F.3d 11, 15 (1st Cir. 2003).  An IJ's findings of fact are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).  See also Dhima, 416 F.3d at 95.[8]

### B.  Merits

The IJ assumed that Tota's testimony was "essentially credible" and that the incidents to which he testified amounted to

---

[7]  Alternatively, a petitioner may directly establish a well-founded fear of persecution based on one of the five grounds listed above.  8 C.F.R. 208.13(b)(2).  Tota does not make this claim, so we decline to address the issue further.

[8]  Findings as to changed circumstances are usually factual determinations.  Mehilli v. Gonzáles, 433 F.3d 86, 93 (1st Cir. 2005).  Here, the IJ's determination was a factual one, based on the 2004 State Department Profile of Asylum Claims.

past persecution. This creates the presumption that Tota has a well-founded fear of future persecution, qualifying him for asylum unless the government rebuts this presumption through evidence of changed country circumstances. Tota's first argument on appeal rests on the premise that the IJ did not afford him this presumption. This is simply incorrect. In making this argument, Tota quotes one line from the IJ's decision: "[t]he court finds it extremely unlikely that the Government will be waiting to persecute a minor employee of the Democratic Party who is returning after four years." This line itself admittedly affords no explicit presumption of a well-founded fear -- indeed it implies unreservedly that Tota's fear is not objective. The IJ, however, stated in his very next sentence that "[t]he court is satisfied that the Government has sustained its burden of proof by a preponderance of evidence with regard to the change of conditions in Albania and that respondent's fear of returning to Albania cannot be said to be well-founded." This sentence indicates that the IJ had recognized a presumption of a well-founded fear but had found that the government rebutted it. We therefore find that, though he may not have said so in as many words, the IJ correctly afforded Tota the presumption of a well-founded fear of future persecution.[9]

---

[9] To the extent that the IJ did not "separate the strands" of this process and "discuss them individually," Waweru v. Gonzáles, 437 F.3d 199, 204 (1st Cir. 2006), we will "uphold a decision of less

-10-

In the alternative, Tota claims that if the IJ did correctly apply the burden-shifting procedure, substantial evidence does not support the determination that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13 (b)(1)(i)(A). We disagree.

The government's evidence of changed country conditions is presented mainly in the form the 2004 State Department Profile of Asylum Claims. While "[t]he advice of the State Department is not binding," Gailius v. INS, 147 F.3d 34, 45 (1st Cir. 1998) (citations and internal quotation marks omitted), State Department reports are "generally probative of country conditions." Palma-Mazariegos v. Gonzáles, 428 F.3d 30, 36 (1st Cir. 2005). Evidence in these reports never "automatically trump[s]" petitioner's specific evidence, Waweru v. Gonzáles, 437 F.3d 199, 203 (1st Cir. 2006) (citations and internal quotation marks omitted) (emphasis in original), and is "open to contradiction." Zarouite v. Gonzáles, 424 F.3d 60, 63 (1st Cir. 2005). Further, "abstract evidence of generalized changes in country conditions, without more, cannot rebut a presumption of a well-founded fear of future persecution." Palma-Mazariegos, 428 F.3d at 35. On the other hand, where a report demonstrates fundamental changes in the specific

_____

than ideal clarity if the agency's path may reasonably be discerned." Id. (quoting Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974) (internal citations omitted)).

-11-

circumstances that form the basis of a petitioner's presumptive fear of future persecution, it "may be sufficient, in and of itself," to rebut that presumption. Id. at 36 (emphasis added).

In the instant case, the profile of asylum claims details at length the progression of Albania's political environment, specifically as it relates to political asylum claims, which constitute a "majority" of Albanian asylum cases. The report states that "there have been no major outbreaks of political violence since 1998,"[10] and that "[t]hough serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time." The report also states that, as of 2004, there were no known cases of "individuals in prison or detention for political reasons." Finally, "there is no indication that the former Communists . . . have sought retribution against opponents of the Communist regime or the many individuals who have returned to Albania after having fled abroad." Indeed, although "[i]n 2003, many countries increased deportations of illegal Albanian residents, . . . [n]o reports or evidence of any mistreatment of returnees at the hands

---

[10] While Tota does allege that acts of persecution were perpetrated against him after 1998, the report's proclamation that there have been no major outbreaks during that time certainly cannot be read to stand for the proposition that no politically motivated violence occurred, which would call into question its applicability to Tota's particular situation. We therefore see no reason why this passage distinguishes Tota from other former DP members who would face improved conditions upon a return to Albania.

-12-

of police or others have been received." These passages point specifically to greatly improved conditions for those in Tota's position -- individuals who suffered past persecution on political grounds at the hands of members of the former Communist regime, and who would be returning to Albania after having fled abroad. This is sufficient, "in and of itself," Palma-Mazariegos, 428 F.3d at 36, to rebut Tota's presumptive well-founded fear of future persecution.

For his part, Tota presents no specific contradictory evidence, nor any other reasons why the changed conditions do not apply to his individual situation. His attempts to discredit the IJ's finding and the methods used to arrive at that finding are unpersuasive.

To this end, Tota first takes issue with the IJ's reference to a passage stating that "there are no indications that the Socialist party either through its own organization or through government authorities is engaged in a pattern of repression of violent behavior against its opponents." Placing great emphasis on the fact that this passage was taken from a section entitled "Since 1998," Tota argues that because his abuses took place between 1998 and 2000, the passage cannot logically support a finding of changed country conditions after that time. This simply misreads the passage as a whole. There is no indication that the title "Since 1998" intends to refer to the conditions contained within the time

frame as being static.  Indeed, the very first line of the section states that "Albania's human rights record has _improved_ _steadily_ since 1997 when the Socialist Party came to power" (emphasis added).  The section also describes specific instances that show significant reductions in politically-motivated violence and arrests since 2000.  The last "large-scale, but generally short-term," arrests were made in conjunction with demonstrations and riots by Democratic Party members in protest of the allegedly rigged 2000 local elections.  The elections of 2001-2003 were "hotly contested," and yet "generally free of violence" and unfolded without police interference.  Outbreaks of violence were isolated and generally limited to clashes between individual party supporters, not initiated by the government or police force.  As for an indicator of future violence, the section states that "in recent years, Albanians have been able to exercise freely their right to change their government through democratic means.  Such a right necessarily includes the ability . . . to organize and campaign broadly free from Government interference."  We therefore hold that the "Since 1998" section, standing alone, can logically support the determination that there has been a fundamental shift in circumstances related to Albania's political freedom since Tota's last abusive incident in early 2000.

Tota next launches a broad-based attack on the government's evidence and the IJ's consideration of the record as

a whole.[11]  His accusation that the IJ neglected to carry out his

official duty to properly weigh the evidence provided by both sides

is meritless.  "[I]n the absence of clear evidence to the contrary,

courts presume that [government agencies] have properly discharged

their official duties."  United States v. Armstrong, 517 U.S. 456,

464 (1996) (quoting United States v. Chemical Foundation, Inc., 272

U.S. 1, 14-15 (1926)) (internal quotation marks omitted).  Tota

provides absolutely no evidence that the IJ neglected to duly

review all of the evidence in the record before making his

decision.

In sum, we find that substantial evidence culled from the

State Department asylum claims report, specifically tailored to the

discussion of political persecution of DP members by the Socialist

government, supports the IJ's finding that the government met its

burden of rebutting Tota's presumptive well-founded fear of

---

[11]   Tota argues that "[w]hile the IJ theoretically could have
reviewed all of the evidence in the record and determined that the
substance of the 33 pages [submitted by the government] outweighed
the volume of the 500 [submitted by petitioner], he neglected to do
so."  The government's evidence consisted of the aforementioned
2004 State Department Profile of Asylum Claims and a 2003 State
Department Country Report on Human Rights Practices.  Much of
Tota's evidence consisted of State Department reports that either
predated or were identical to those submitted by the government.
Tota also submitted a lengthy article detailing violations of media
freedom and others detailing mistreatment of suspected criminals.
Neither issue is particularly relevant to an analysis of Tota's
particular situation.  Finally, to the extent that the sheer volume
of evidence introduced into the record is a valid consideration,
Tota grossly overstates his case by double-counting many articles
entered into the record both directly and as appendices to his
original asylum application.

persecution.  Tota has provided no direct evidence to refute the IJ's finding, and his criticisms of the methods and reasoning used by the IJ are unpersuasive.  There is thus no basis to overturn the IJ's denial of Tota's asylum claim.[12]

### C.  BIA's Summary Affirmance

Finally, Tota claims that the BIA violated its own procedure by which it may affirm a decision of the IJ without opinion.  Under this procedure, the BIA may summarily affirm the decision of an IJ if it determines that (i) the IJ's decision was correct; (ii) any errors in the IJ's decision were either harmless or nonmaterial; and (iii) either the issues on appeal are squarely controlled by existing precedent, and do not involve application of this precedent to a novel factual situation, or are not so substantial that the case warrants the issuance of a written opinion.  8 C.F.R. § 1003.1(e)(4).

Tota does not challenge the BIA's summary affirmance procedure itself.[13]  Instead, he claims that the BIA misapplied its own regulations by issuing a summary affirmance based on an

---

[12]  Because Tota's asylum claim fails, we need not evaluate his claim under the more stringent standard for withholding of removal. Albathani, 318 F.3d at 374.

[13]  We have repeatedly rejected such challenges because this Court can review the IJ directly and remand to the BIA for further adjudication as is warranted.  See Dhima, 416 F.3d at 96-97 (1st Cir. 2005) ("although the summary affirmance does not give the BIA's reasons, '[t]he courts will continue to have the IJ's decision and the record upon which it is based available for review.'") (quoting Albathani, 318 F.3d at 377-78).

incorrect result and upon errors of law and fact that were neither harmless nor immaterial. This claim does not alter our initial analysis. If the IJ does issue an erroneous decision, we will remand to the BIA regardless of whether a petitioner challenges the BIA's summary affirmance of that decision. If, on the other hand, the IJ's decision is correct, and any errors are harmless and nonmaterial, the BIA's summary affirmance procedure will not have been misapplied. In the instant case, because we have found that the IJ's decision is supported by substantial evidence, and that the IJ did not make any harmful or material errors of fact or law, Tota's claim fails. See, e.g., Ziu v. Gonzáles, 412 F.3d 202, 204 (1st Cir. 2005) (rejecting petitioner's challenge that the BIA misapplied its summary affirmance procedure to an incorrect IJ decision upon finding that the IJ's decision was not erroneous).

## III. <u>Conclusion</u>

For the reasons stated above, we deny the petition for review and affirm the decision of the IJ, and the summary affirmance of the BIA.

**<u>Affirmed</u>**.