# United States Court of Appeals
## For the First Circuit

No. 06-1338

VIOLETA ALIBEAJ,

Petitioner,

v.

ALBERTO GONZALES, ATTORNEY GENERAL,

Respondent.

ON PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Lipez, Circuit Judge,

Cyr, Senior Circuit Judge,

and Singal,[*] District Judge.

Carlos E. Estrada, on brief for petitioner.
    Peter D. Keisler, Assistant Attorney General, Greg D. Mack,
Senior Litigation Counsel, and Patricia M. Bowman, Attorney, Tax
Division, U.S. Department of Justice, on brief for respondent.

November 22, 2006

---

[*]Of the District of Maine, sitting by designation.

**CYR, <u>Senior Circuit Judge</u>**. Violeta Alibeaj petitions for review of a decision by the Board of Immigration Appeals ("BIA") which affirmed an immigration judge's denial of her asylum application. We deny the petition.

**I**

<u>BACKGROUND</u>

In February 2001, Alibeaj, a native and citizen of Albania, entered the United States illegally. During her removal proceedings, Alibeaj submitted an application for asylum, claiming that the Albanian Communist and Socialist Parties had persecuted her and her family for the last fifty-eight years, as follows: In 1943, the communist government arrested and executed her grandfather and an uncle, both leaders of the anti-communist National Party. During the 1980s, the government arrested and tortured her future husband and a brother-in-law. In 1990, Alibeaj attended a pro-democracy demonstration in the capital city of Tirana, at which anti-riot police struck her in the head. In 1991, following the fall of the communist regime in Albania and a transfer of governmental power to the Democratic Party, Alibeaj joined a support group for persons who had been victims of political persecution by the communist government.

In 1997, the Socialist Party, which included many former communists, won the national election and regained control of the government. When Alibeaj went into labor with her first child that

year, the hospital did not dispatch an ambulance to her home, and refused to attend to her medical needs or treat her pain during sixteen hours of labor. Consequently, her baby was born with serious mental defects. Alibeaj contends that her government-appointed gynecologist – the daughter of a political opponent of her husband's family whose father had raped Alibeaj's mother-in-law – was the instigator of this denial of adequate medical treatment. Thereafter, Alibeaj sought medical assistance for her ailing son, but was refused treatment when she informed the doctors and hospitals that she was a supporter of the Democratic Party. Alibeaj traveled to Italy for two years to obtain medical treatment for her son, while her husband remained in Albania. Alibeaj's son subsequently died of birth defects while in Italy.

In 1997, members of SHIK, the Albanian secret police organization, arrested and tortured Alibeaj's sister-in-law after she wrote a history of Alibeaj's husband's family, which was critical of the former communist regime's repressive tactics against its political opponents. When the sister-in-law was released after five days, she was so psychologically shell-shocked that she was unable to speak. Eventually, she emigrated to Italy, where she committed suicide. The government unsuccessfully continued its search for copies of the sister-in-law's book, at Alibeaj's residence and elsewhere.

In 2000, following two years in Italy, Alibeaj returned

to Albania, whereupon SHIK agents stalked Alibeaj and threatened to kill her and her family if they did not leave Albania. On one occasion, SHIK agents physically assaulted her husband and stole all of his construction tools, thereby depriving him of his livelihood. Thereafter, Alibeaj left Albania for the United States.

In September 2004, an immigration judge ("IJ") orally rejected her asylum application, stating as follows:

> I'm going to deny the application [for asylum] because I'm just not seeing any connection here between any of the five enumerated grounds in what she's related. And I'm not sure that what she's related amounts to past persecution to her. And I don't see that she has a well-founded fear of future persecution on account of any of the five enumerated grounds if she returns to Albania.

Alibeaj filed a timely appeal of the IJ's decision to the BIA. The BIA adopted and affirmed, thus signifying that its "conclusions upon review of the record coincide with those which the [IJ] articulated in his or her decision." The BIA added:

> We agree with the [IJ] that the respondent failed to establish that she suffered persecution. Despite the regrettable actions that have befallen the respondent and her family, we cannot find that the incidents described rise to the severity to constitute persecution. We further are unable to find that the respondent has a well-founded fear of persecution if she returns to Albania. We cannot identify any particular factors that would cause us to conclude that the respondent's fear of persecution on account of an enumerated ground is well-founded based on current political conditions in Albania. In

-4-

> addition, an asylum applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances, it would be reasonable to expect the applicant to do so. The respondent has not established that internal relocation is not a viable option. The decision of the [IJ] is also affirmed for the reasons provided herein.

Alibeaj petitions for review of the BIA decision.

## II

## DISCUSSION

Alibeaj contends that the IJ's and BIA's finding that she did not suffer past persecution in Albania was not supported by the evidence, which showed serious political retribution by the communists and socialists in the form of executions, torture, beatings, death threats, and denials of essential medical care.

Eligibility for asylum requires that the alien prove her status as a "refugee," 8 U.S.C. § 1158(b)(1)(A), (b)(1)(B)(i); see Mehilli v. Gonzales, 433 F.3d 86, 90 n.5 (1st Cir. 2005), in that she suffered past persecution or has a well-founded fear of future persecution based on race, religion, nationality, membership in a particular social group, or political opinion if she were to return to her country of nationality, see id. (citing § 1101(a)(42)(A)). The Alibeaj asylum claim alleges persecution on account of "political opinion." If the alien cannot meet her burden to

-5-

establish past persecution, she will be entitled to asylum only if she can establish that she harbors a fear of future persecution that is both subjectively genuine and objectively reasonable. See Palma-Mazaiegos v. Gonzales, 428 F.3d 30, 34-35 (1st Cir. 2005).

Should the alien meet her burden of establishing past persecution, however, a presumption arises that her fear of future persecution is well-founded. See Bollanos v. Gonzales, 461 F.3d 82, 85 (1st Cir. 2006). In order to rebut that presumption, the government must demonstrate by a preponderance of the evidence that (i) the country of origin has experienced a "fundamental change in circumstances" since the alien's departure which obviates her previously well-founded fear of persecution, or (ii) the alien reasonably could avoid future persecution by relocating to another part of the country. 8 C.F.R. § 208.13(b)(1)(i). We review the IJ's and the BIA's findings under the "substantial evidence" standard, and will reverse only if we conclude that the record evidence would compel a contrary finding. See Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005); see also Berrio-Barrera v. Gonzales, 460 F.3d 163, 167 (1st Cir. 2006) (noting that whether applicant has proved that persecution was motivated by one of the five statutorily protected grounds is a question of fact).

A.   "**Past Persecution**"

"[E]stablishing past persecution in a daunting task," and Alibeaj "bears a heavy burden." Guzman v. INS, 327 F.3d 11, 15

-6-

(1st Cir. 2003). Although her experiences of political discrimination in Albania certainly are regrettable, Alibeaj cannot surmount the deferential standard of review. First, for purposes of establishing the right to asylum, the discriminatory experiences must have reached a fairly high threshold of seriousness, as well as some regularity and frequency. See Susanto v. Gonzales, 439 F.3d 57, 59-60 (1st Cir. 2006) (noting that "[t]he baseline rule is that past persecution requires 'more than mere discomfiture, unpleasantness, harassment, or unfair treatment'" (citation omitted)). The more serious episodes of anti-communist persecution against the Alibeaj family and her husband's family occurred either in the remote past (e.g., the 1943 execution of her grandfather and uncle), or predated the fall of the communist regime in 1992 (e.g., the arrest and torture of her future husband). Similarly, although the police beat Alibeaj during a pro-democracy demonstration in 1990, this occurred prior to the fall of the communist regime, and Alibeaj never testified to any permanent or serious physical injuries. See id. at 60 (noting that asylum applicant failed to prove "persecution" when "no physical confinement and no serious physical injuries resulted").

Moreover, the post-1992 incidences were too sporadic or causally tenuous to compel the IJ to find politically-motivated persecution. Although Alibeaj suspected that her gynecologist sabotaged her 1997 delivery, she herself noted also that the

-7-

hospital staff neglected her need for pain medication because they were watching the television reports regarding Princess Diana's death.  See Toloza-Jimenez v. Gonzales, 457 F.3d 155, 160 (1st Cir. 2005) (observing that an asylum applicant has the burden to show the "causal connection between her experiences and . . . the statutory grounds for persecution").  Similarly, Alibeaj noted that the medical personnel at other facilities subsequently refused to treat her newborn son's condition, yet she failed to provide any specific facts from which the IJ might evaluate whether Alibeaj made a reasonably exhaustive search for medical treatment prior to leaving for Italy.  Absent evidence to the contrary, it would seem entirely reasonable that some physicians in Albania support the Democratic Party.  Thus, if Alibeaj experienced but a couple of politically-motivated refusals of medical treatment before she abandoned her efforts, this limited impediment might not suffice alone to establish "persecution."

Although the 1997 arrest and torture of Alibeaj's sister-in-law arguably shows that the sister-in-law was persecuted, Socialist Party sympathizers targeted the sister-in-law for a reason that does not pertain to Alibeaj:  she wrote and threatened to publish a "tell-all" book critical of the former communist regime.  Alibeaj acknowledges that she has never been a member of the Democratic Party, nor taken any concrete political actions comparable to those of her sister-in-law which unduly might

-8-

antagonize Communist or Socialist Party sympathizers.

The nature of the death threats, beating, and misappropriation of property that Alibeaj and her husband suffered upon her return from Italy in 2000 is also plainly insufficient to compel a finding of persecution. The allegations are serious indeed, but police misdeeds even more egregious or sustained have failed to clear the persecution hurdle. See, e.g., Susanto, 439 F.3d at 59-60 (observing that even physical abuse does not necessarily prove persecution, and collecting cases); Zui v. Gonzales, 412 F.3d 202, 204-05 (1st Cir. 2005) (same, concerning threats to life or health).

## B.    Changed Circumstances

Even if we were to conclude that the IJ and BIA erred in finding that the experiences described by Alibeaj did not rise to the level of past "persecution," and that Alibeaj therefore met her burden to establish past persecution, the government had the opportunity to rebut the presumption of a well-founded fear of future persecution by proving by a preponderance of the evidence that the circumstances in Albania had changed so fundamentally since Alibeaj left in 2001 as to obviate her otherwise well-founded fear of future persecution. See 8 C.F.R. § 208.13(b)(1)(i). Indeed, the BIA specifically held that the government had met its burden, stating that it could not "identify any particular factors that would cause us to conclude that the respondent's fear of

-9-

persecution on account of an enumerated ground is well-founded based on <u>current</u> <u>political</u> <u>conditions</u> in Albania." (Emphasis added.) The record amply supports this factual finding.

The agency adduced the 2003 United States State Department Country Report on Human Rights Practices for Albania (dated 2/25/04), which discloses that the climate for political oppositionists in Albania has fundamentally improved since 2001. See <u>Tota</u> v. <u>Gonzales</u>, 457 F.3d 161, 166 (1st Cir. 2006) ("[W]here a [State Department] report demonstrates fundamental changes in the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution, it 'may be sufficient, <u>in</u> <u>and</u> <u>of</u> <u>itself</u>,' to rebut that presumption."); <u>Palma-Mazariegos</u>, 428 F.3d at 36 (noting that State Department reports are "generally probative of country conditions"). For example, Albania held multi-party parliamentary elections in 2003 under a reformed electoral code with almost no reported incidences of the type of politically-motivated violence that had plagued its earlier post-communist elections. The Socialist Party failed to win a majority, and was forced to form a coalition government with two other minor parties, with the Democratic Party as the second largest vote-getter sitting in opposition. In 2003, there were no reports of politically-motivated killings, disappearances, or detainees held strictly for political reasons, and Albania ratified the Convention Against Torture.

Alibeaj cites only one report that police used excessive force: at a May 2003 rally in Tirana of former political prisoners seeking government compensation for their enforced hard labor under the former communist regime. However, this isolated reference would not compel the IJ's factfinding, given that (i) Alibeaj has never contended that she wished or intends to petition the government for redress, and/or that she is even eligible for such compensation; and (ii) the Report simultaneously states that the Albanian government condemned this police malfeasance and took immediate legislative steps to prevent its recurrence.

Thus, the BIA's conclusion that the political circumstances in Albania have changed fundamentally in Albania over the past six years is entirely consistent with its recent precedent. See Bollanos v. Gonzales, 461 F.3d 82, 86 (1st Cir. 2006) (noting significance of changed circumstances in Albania and remedial measures taken by new government in 2003 to reduce police misconduct); Tota, 457 F.3d at 167 (observing that "'[t]hough serious political repression existed in the past, there are no indications of systemic political persecution in Albania at the present time'"); cf. Susanto, 439 F.3d at 60-61 (observing that Indonesian government "has taken serious remedial measures" in response to intense international condemnation of 1998 anti-Chinese riots); Nikijuluw v. Gonzales, 427 F.3d 115, 122 (1st Cir. 2005) (citing a State Department Country Report's observation of a

significant decline in violence against Christians in Indonesia).[1]

As the agency record does not compel a finding that Alibeaj would suffer politically-motivated persecution if removed to Albania, the BIA decision must stand.

**<u>The petition for review is denied</u>**.

---

[1]In her petition for review, Alibeaj does not challenge the alternative BIA holding that she failed to prove that she could not reasonably have located to another part of Albania to avoid future persecution, and therefore, we neither review nor comment on that aspect of its holding.