# United States Court of Appeals
## For the First Circuit

No. 13-1273

KOSTA VASILI; ANDRONIQI VASILI;
KLEOPATRA VASILI; ALEKSANDROS VASILI,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Torruella, Ripple,[*] and Thompson
Circuit Judges.

Saher J. Macarius and Audrey Botros on brief, for petitioners.
Deitz P. Lefort, Trial Attorney, Office of Immigration Litigation, Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Derek C. Julius, Senior Litigation Counsel, on brief, for respondent.

October 16, 2013

---

[*] Of the Seventh Circuit, sitting by designation.

**THOMPSON, Circuit Judge**.  Petitioner Kosta Vasili, a native and citizen of Albania, seeks review of a final removal order requiring him and his wife, Androniqi, and their two children, Kleopatra and Aleksandros, to return to Albania.[1]  The petitioners say their application for asylum should have been granted on the basis of past persecution and their well-founded fear of future persecution if they are returned to their homeland.  We affirm the final removal order.

## I. BACKGROUND

Kosta was born in Finiq, Albania in September of 1961 and he and Androniqi married in 1992.  Kosta did not have a good life under Communist[2] rule, and in March of 1992 he became involved with the founding of Albania's Democratic Party.  Kosta assisted the fledgling political party by traveling to various villages handing out flyers, "pretty much advertising for the new party."  Some time later, he and his wife relocated to Greece, where Kosta found occasional work as an auto mechanic.  He did not have a right to permanently remain in Greece, and he returned to Albania on

---

[1]Androniqi, Kleopatra, and Aleksandros are derivatives of Kosta Vasili's application for asylum.  We refer to the individual petitioners by their first names for the sake of clarity, and we utilize the spellings set forth in their applications for asylum and for withholding of removal.

[2]Kosta used the term "communists" to refer to communists, socialists, and members of the Socialist Party.  As the distinctions between these groups are not material here, we follow this convention and use the terms interchangeably.

multiple occasions to visit his mother, brother, and sister. Kosta and Androniqi's daughter, Kleopatra, was born in Greece in 1993.[3] Kosta and his family returned to Albania in June of 2001 and moved in with his mother. While there he resumed his political involvement, which once again consisted of passing out flyers and advocating for the Democratic Party. It was not long after the family's return to Albania that the two incidents upon which the petitioners base their claim for asylum occurred.

One day, Kleopatra was playing alone outside when she was seriously injured after strangers threw something into their home's courtyard. Kosta did not specify what this "something" was in his testimony before an immigration judge ("IJ"), but in his written declaration in support of his application for asylum, he stated masked men threw a grenade into the yard. According to the written application, the blast knocked Kleopatra off a set of stairs where she had been sitting.

Androniqi was inside the home at the time of the incident and did not see what happened. She heard a "big noise" while their daughter was outside, and when she went to investigate she saw

---

[3]Kosta testified before an immigration judge ("IJ") that Kleopatra was born in 1997. However, he listed Kleopatra's date of birth as July 22, 1993, on his application for asylum and indicated in his declaration in support thereof that she was eight years old at the time of an incident in 2001. The IJ also found that Kleopatra was eight years old at the time of the incident. While we note the discrepancy in age, the IJ found Kosta generally credible, and it is immaterial to the outcome at any rate.

Kleopatra on the ground. She surmised that Kleopatra fell off the stairs and hurt herself. Androniqi believes the noise she heard was the sound of a grenade because Kleopatra told her later that she heard a loud sound before she fell.

Kleopatra suffered a serious head injury from her fall. The Vasilis took their daughter to the hospital, where she immediately underwent surgery. Kleopatra remained hospitalized for ten to twelve days.

Kosta does not know who was behind this incident, but he suspects it was perpetrated by members of the Socialist Party because of his involvement with the Democratic Party. He believes this is so because his entire family had problems with the communists in the past, particularly his grandfather (who was jailed) and his uncle. He himself indicated that he was not permitted to attend school or to carry a gun when he served in the army. Androniqi does not know who was behind the incident either, but like her husband she suspects it was "people that were against [her] husband because he was working for the new democracy, the party."

The second incident occurred in July of 2001. Three men wearing helmets and carrying guns stopped Kosta while he was driving. The men beat Kosta with their guns and warned him to stop working with the Democratic Party. There is no evidence in the record as to the nature and extent of any injuries Kosta suffered

or whether he sought medical treatment as a result of this beating.

Kosta did not report either of these two incidents to the police because he did not believe they would help him or even investigate what had happened. Instead, Kosta and his family left Albania and traveled to Greece, where they obtained visas permitting entry into the United States. They entered the country in August of 2001 and ultimately overstayed their visas. Conceding their removability, the petitioners filed applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

Kosta testified before an IJ, expressing fears of returning to Albania because of what happened to him and his family in the past. If he goes back, he believes he will once again become a target as a result of his political beliefs and activities. While he admitted the Democratic Party has won elections in Albania in recent years, he also stated that the people who harmed him and his family remain in his village. Kosta conceded, however, that no one has harmed his mother, brother, or sister in any way since he left Albania in 2001.

The IJ also considered the Department of State's 2009 Country Report on Albania ("Country Report"). The Country Report indicates the Albanian constitution gives its citizens the right to peacefully change their government, and this right is in fact exercised through periodic elections. Although the most recent (as

of the date of the Country Report) parliamentary elections occurred in a polarized environment in which media coverage was biased in favor of the Socialist Party and Democratic Party (which, we note, Kosta supports), a total of thirty-two political parties campaigned freely across the country. Political parties operated without outside influence and there were no major disputes or violence throughout the election. The Country Report does not indicate there has been any politically-motivated violence between supporters of the Democratic and Socialist Parties or, for that matter, that politically-motivated violence is a problem anywhere in Albania.

The IJ denied the petitioners' requests for asylum, withholding of removal, and protection under CAT. She found that both Kosta and Androniqi were credible witnesses, but failed to show they were eligible for asylum. While the IJ characterized the injury to Kleopatra as a "very serious and unfortunate incident," she determined that the petitioners did not prove any connection between the incident and Kosta's political beliefs. According to the IJ, Kosta and Androniqi's suspicions, standing alone, were insufficient to meet their burden of proof. She also determined the second incident did not rise to the level of persecution because Kosta did not show he experienced something more than unpleasantness, harassment, or even basic suffering. As such, the IJ concluded the petitioners were not eligible for asylum because

they failed to sustain their burden of demonstrating they had been persecuted in the past on account of Kosta's political views.

The IJ continued. Even if the petitioners had been able to establish past persecution, any presumption of a well-founded fear of future persecution had been rebutted by fundamental changes chronicled in the Country Report. She specifically relied on the Report's conclusion that there had been no major disputes or violence during the last elections, along with the lack of any reports of politically-motivated violence between members of the Socialist Party and the Democratic Party. The IJ also found it significant that Kosta's mother and siblings have remained in Albania since the summer of 2001 and have not been harmed in any way. Wrapping things up, the IJ found the petitioners did not have a well-founded fear of future persecution and denied their request for asylum.

The petitioners appealed to the Board of Immigration Appeals ("BIA"), which issued a written decision on January 29, 2013. Without disturbing the IJ's credibility determination, the BIA agreed that the petitioners failed to meet their burden of proof. The BIA found the petitioners did not establish past persecution because there was no evidence Kleopatra's injuries were caused by the Socialist Party instead of "an unusual accident." As for the incident involving the three men with guns, the BIA determined it did not result in injuries severe enough to qualify

as "persecution."  The BIA concurred that the Country Report demonstrated a fundamental change in circumstances sufficient to rebut any presumption of a well-founded fear of future persecution. Thus, the BIA concluded the petitioners failed to demonstrate eligibility for asylum, withholding of removal, or protection under CAT, and dismissed their appeal.

The petitioners' timely appeal to this Court followed.

## II. DISCUSSION

Our review of the proceedings below "is limited to determining whether substantial evidence in the administrative record supports the IJ's findings that petitioner[s] neither suffered from cognizable past persecution nor demonstrated a well-founded fear of future persecution." Lumaj v. Gonzales, 446 F.3d 194, 198 (1st Cir. 2006).  The standard of review is "deferential," and we must uphold the BIA's decision "so long as its decision is supported by substantial evidence in the record."  Topalli v. Gonzales, 417 F.3d 128, 131 (1st Cir. 2005) (quoting Rodriquez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005)). Determinations as to witness credibility are to be accorded "great respect" when supported by specific findings.  Lumaj, 446 F.3d at 198.

Here, the IJ rendered a decision from the bench and the BIA released a detailed written opinion affirming the IJ's decision and providing its own analysis.  Accordingly, we review both

decisions.  Rashad v. Mukasey, 554 F.3d 1, 4 (1st Cir. 2009). Questions of law, of course, are reviewed de novo.  López-Castro v. Holder, 577 F.3d 49, 52 (1st Cir. 2009).  And, barring an error of law, we reverse "only if the record is such as to compel a reasonable factfinder to reach a contrary determination."  Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008).

## A.  Request for Asylum

Pursuant to 8 U.S.C. § 1158(b)(1) and  8 C.F.R. § 208.13, an applicant for asylum bears the burden of proof and "must show either past persecution or well-founded fear of future persecution."  Albathani v. Immigration & Naturalization Serv., 318 F.3d 365, 373 (1st Cir. 2003).  To establish past persecution, the applicant must demonstrate such persecution was "on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 C.F.R. § 208.13(b)(1); see also 8 U.S.C. § 1158(b)(1)(B)(i).  We have previously held that to qualify as "persecution" within the meaning of the statutory definition, the complained-of acts must be "the direct result of government action, government-supported action, or government's unwillingness or inability to control private conduct."  Nikijuluw v. Gonzales, 427 F.3d 115, 120-21 (1st Cir. 2005).

An applicant's successful showing of past persecution "establishes a rebuttable presumption of a well-founded fear of future persecution."  Harutyunyan v. Gonzales, 421 F.3d 64, 67 (1st

-9-

Cir. 2005); see also 8 C.F.R. § 208.13(b)(1). The presumption of well-founded fear may be rebutted if the government is able to establish, by a preponderance of the evidence, that "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution." 8 C.F.R. § 208.13(b)(1)(i). Information appearing in a country report showing "fundamental changes in the specific circumstances that form the basis of a petitioner's presumptive fear of future persecution" may be sufficient to rebut any well-founded fear of future persecution. Uruci v. Holder, 558 F.3d 14, 19-20 (1st Cir. 2009) (quoting Chreng v. Gonzales, 471 F.3d 14, 22 (1st Cir. 2006)).

## 1. Past Persecution

An individual seeking asylum "'bears a heavy burden,'" and faces a "'daunting task'" in establishing subjection to past persecution. Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006) (quoting Guzman v. Immigration & Naturalization Serv., 327 F.3d 11, 15 (1st Cir. 2003)). To meet this standard, "the discriminatory experiences must have reached a fairly high threshold of seriousness, as well as [occurred with] some regularity and frequency." Id. Infrequent beatings, threats, or periodic detention, we have said, do not rise to the level of persecution, and the nature and extent of an applicant's injuries are relevant to the ultimate determination. See Attia v. Gonzales,

477 F.3d 21, 23-24 (1st Cir. 2007) (no persecution where the applicant was beaten twice over a nine year period and experienced a "general climate of discrimination"); Topalli, 417 F.3d at 132 (seven arrests accompanied by short periods of detention and physical beatings over the span of two years found not to constitute past persecution); Bocova v. Gonzales, 412 F.3d 257, 263-64 (1st Cir. 2005) (no past persecution where the petitioner was arrested, beaten, and threatened with death twice in an eight year period, even though one of those incidents resulted in a loss of consciousness and subsequent hospital treatment); Nelson v. Immigration & Naturalization Serv., 232 F.3d 258, 263-64 (1st Cir. 2000) (no persecution where the petitioner had been subjected to physical abuse and placed in solitary confinement for less than seventy-two hours on three different occasions). Thus, "persecution requires 'more than mere discomfiture, unpleasantness, harassment, or unfair treatment'" and "'implies some connection to government action or inaction.'" López-Castro, 577 F.3d at 54 (quoting Nikijuluw, 427 F.3d at 120-22).

Here, the IJ found that the petitioners submitted credible evidence regarding two incidents: the injury to Kleopatra and the "traffic stop incident" in which Kosta was beaten by three men with guns. However, the IJ found--and the BIA agreed--that the testimony as to these incidents was not sufficient to establish

-11-

past persecution. We are satisfied that these decisions were supported by substantial evidence in the record.

With respect to the first incident, both Kosta and Androniqi admitted they did not witness what happened--in fact, it is not clear from the record what actually occurred that day--nor do they know who was responsible. While they both suspect they were targeted because of Kosta's political activities, this is nothing more than sheer speculation and supposition. There was no evidence whatsoever of a connection between the incident and government action or inaction. Without any evidence of who was responsible or what prompted the incident, "it is no more than a guess that a nexus existed between the [incident] and a statutorily protected ground." See López-Castro, 577 F.3d at 53. The petitioners' hypothesis as to the identity and motivation of the perpetrators is insufficient to meet their burden of proof. See id.

Substantial evidence also supported the conclusion that the "traffic stop incident" did not rise to the level of persecution. While the IJ credited Kosta's testimony that members or supporters of the Socialist Party administered the beating and were motivated by Kosta's political activities, the record is wholly devoid of evidence as to the nature and extent of Kosta's injuries, if any. There is no evidence as to whether he sought medical attention as a result of the incident. Furthermore, there

is no evidence Kosta was detained or imprisoned in connection with that incident or at any point after his return to Albania in 2001. We have previously determined that much more egregious acts of violence and imprisonment, including attacks resulting in a loss of consciousness and repeated detentions, are not sufficiently severe as to constitute persecution.

Summing up, while Kleopatra certainly suffered a tragic and serious injury in 2001, the evidence in the record does not compel us to find the incident was "on account of" Kosta's political opinions or activities. Similarly, the BIA and the IJ's finding that the "traffic stop incident" did not rise to the level of persecution is supported by substantial evidence. Thus, substantial evidence supported the BIA and the IJ's determination that the petitioners failed to demonstrate they experienced past persecution.

## 2. Fundamental Change in Albania

The BIA and the IJ proceeded to analyze Kosta's application with the assumption that past persecution had been shown. Both concluded the petitioners do not have a well-founded fear of future persecution should they be returned to Albania. Having carefully reviewed the entire record, we are not "compelled" to disagree.

Noting Kosta's mother, sister, and brother's ongoing residence in Albania since his 2001 departure, the IJ found it

significant that none of them have had any problems with the Socialists or the government, even though Kosta's own testimony indicated that his entire family had a generations-long history of difficulty with both. Under such circumstances, where the record does not "provide[] a satisfactory differentiation" between a petitioner and similarly-situated family members, Aguilar-Solis v. Immigration & Naturalization Serv., 168 F.3d 565, 573 (1st Cir. 1999), the lack of harm to remaining family members is a factor that is "entitled to weight in the decisional calculus." López-Castro, 577 F.3d at 54 n.4. That Kosta's family members continued to live unharmed in Albania explicitly and permissibly weighed against the reasonableness of his fear of future persecution should he return. Given the limited scope of our review, it is not for us to second-guess the weight the IJ assigned to this factor.

The BIA and the IJ also found that the Country Report showed a fundamental change in Albania's political climate since the petitioners' departure. They concluded these changes rebut any presumption that the petitioners could have a well-founded fear of future political persecution. This finding is supported by substantial evidence in the administrative record.

According to the Country Report, Albanian citizens exercise their right to change their government peacefully through periodic elections. The most recent election prior to the IJ's decision took place in a "highly polarized environment" in which

-14-

thirty-two parties campaigned freely, there was no major violence, and the parties operated without restriction or outside interference. There were no reports of political violence between Socialist and Democratic Party members or, for that matter, of any politically-motivated violence.

Nevertheless, the petitioners argue the BIA and the IJ erred because the Country Report also points out the presence of criminal violence in Albania, as well as some corruption and incompetence within the police force. This argument is wholly without merit. General criminal activity is not evidence of a well-founded fear of political persecution. See, e.g., id. at 53 ("[A]lthough crime is an unpleasant consequence of life in many modern societies, victimization by a criminal element, without more, is not probative of ethnic persecution."). Simply put, the Country Report does not reflect any political persecution in the recent past.

Indeed, our decisions over the last several years recognize the "fundamental change" in Albania's political climate. In 2009 we affirmed the denial of an Albanian national's application for asylum. Uruci 558 F.3d at 16. Uruci involved a member of the Democratic Party who alleged he would be persecuted if returned to Albania. Id. In affirming the immigration judge's denial of the application we relied upon our 2006 opinion in Tota v. Gonzales, 457 F.3d 161 (1st Cir. 2006), where we found "that

'substantial evidence culled from the [2004] State Department asylum claims report, specifically tailored to the discussion of political persecution of [Democratic Party] members by the Socialist government, supports [a] finding that the government met its burden of rebutting [a] . . . presumptive well-founded fear of persecution.'" Uruci, 558 F.3d at 20 (quoting Tota, 457 F.3d at 168 (bracketed text and ellipses in original)). We then proceeded to uphold several administrative findings: violence in Albania peaked in 1997 and 1998 and subsequently declined, the government and political parties do not engage in policies of abuse or coercion against political opponents, and there are no indications that the Socialist Party engages in a pattern of repression or violent behavior against its opponents. Id.

And in 2010 we determined that another Albanian citizen did not have a well-founded fear of future persecution at the hands of the Socialist Party. Nako v. Holder, 611 F.3d 45, 50 (1st Cir. 2010). The Department of State's 2006 Country Report and 2006 Profile of Asylum Claims and Country Conditions for Albania established that "there were no major outbreaks of political violence in Albania since 1998," the Democratic Party was in power after peaceful elections in 2005, and "the political parties had ceased abuse or coercion of political opponents." Id. at 48. Of particular import here is the following observation:

> Those reports not only indicated that the Democratic Party now controls Albania, but

> also thoroughly documented the cessation of politically motivated violence and persecution by either party as well as a decline in police misconduct. This court has previously deemed these particular facts fatal to nearly identical petitions for review by other Albanian Democratic Party members who have claimed a fear of political persecution by the Socialist Party.

Id. at 49 (emphasis added) (citing Uruci, 558 F.3d at 19-20; Alibeaj, 469 F.3d at 193; Bollanos v. Gonzales, 461 F.3d 82, 86 (1st Cir. 2006); Tota, 457 F.3d at 166-68). The petitioner in Nako had "not pointed to any concrete acts of political violence" to call the conclusions of the 2006 Country Report into question, nor did he present any evidence that he would likely be singled out for political persecution by the Socialist Party. Id. at 50.

Here, as in Nako, the BIA and the IJ relied on the Country Report to support their finding of fundamental change in Albania. There is not even a scintilla of evidence in the record contradicting or calling into question any of the findings contained within the Country Report. The petitioners did not present any evidence showing the resumption or likely resumption of political violence in Albania, nor did they come forward with any evidence showing Kosta is likely to be singled out and subjected to political persecution should he return there. As no reason has been presented to us as to why we should depart from our holdings in Nako, Uruci, and Tota, we affirm the BIA and the IJ's

-17-

determination that the petitioners do not have a well-founded fear of future persecution and are, therefore ineligible for asylum.

## B.  Alternative Requests

Although the petitioners initially sought withholding of removal and/or protection under CAT, they do not press these claims on appeal.  Their brief only addresses Kosta's request for asylum, and alternative forms of relief are not mentioned at all until the final page.  Even there, however, withholding of removal and protection under CAT merely appear as part of their boilerplate prayer for relief.  Therefore, we find the petitioners have waived any request for withholding of removal or protection under CAT. See Nikijuluw, 427 F.3d at 120 n.3 (petitioner waived claims for withholding of removal and protection under CAT by failing to address them in his brief).

Assuming such claims were not waived, our conclusion that the BIA and the IJ's determinations were supported by substantial evidence is fatal.  This is because a petitioner bears a heavier burden of proof in an application for withholding of removal or protection pursuant to CAT than he does in an application for asylum.  Lumaj, 446 F.3d at 198 (a request for withholding of removal "cannot succeed when an asylum claim fails"); Settenda v. Ashcroft, 377 F.3d 89, 94 (1st Cir. 2004) ("[A] CAT claim . . . establishes a higher burden of proof than an asylum claim . . . ").  Because the petitioners did not meet their burden to show

eligibility for asylum, it inevitably follows that their requests for withholding of removal and protection under CAT must fail.

### III. CONCLUSION

The BIA and the IJ's denial of the petitioners' application for asylum was supported by substantial evidence in the record, including evidence of a fundamental change in Albania such that the petitioners do not have a well-founded fear of future persecution. Because nothing in the record compels us to reach a contrary conclusion, we affirm the BIA and the IJ's denial of the asylum claim. As the petitioners failed to show they are eligible for asylum, they are similarly ineligible for withholding of removal and protection under CAT.

We, therefore, **deny** the petition for review and **affirm** the final order of removal.