# United States Court of Appeals
## For the First Circuit

No. 12-1091

XIAN TONG DONG,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Thompson, Selya and Lipez,
Circuit Judges.

Nathan Weill and Law Office of Nathan Weill on brief for petitioner.
Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Terri J. Scadron, Assistant Director, and Shahrzad Baghai, Trial Attorney, Office of Immigration Litigation, Civil Division, on brief for respondent.

October 3, 2012

**SELYA**, **Circuit Judge**. This case requires us to decide, for the first time, whether 8 U.S.C. § 1101(a)(42)(B), a statute enacted to pave the way for asylum for victims of China's coercive population control policies, extends automatically to a spouse of a person forced to undergo an abortion. We join several of our sister circuits in holding that it does not.

The issue arises in connection with the asylum application of Xian Tong Dong, a Chinese national, who seeks to remain in the United States because of, among other things, his wife's forced abortion. Before us, he solicits judicial review of a final order of the Board of Immigration Appeals (BIA) denying him asylum and decreeing his removal to his homeland. After careful consideration, we reject his petition.

The record reflects that the petitioner entered the United States without inspection in March of 2006. The Chinese government previously had forced his wife to undergo an abortion, and he hoped to send for her and their son after gaining permission to remain.

The petitioner applied for asylum on October 10, 2006. Federal authorities responded by instituting removal proceedings and referring his case to the immigration court. The case was heard on the merits by an immigration judge (IJ) on December 2, 2009. In the interim, the petitioner became involved with the Chinese Evangelical Church in Boston, Massachusetts. He was

baptized there in April of 2009. He expanded the grounds on which he sought asylum to include a fear of religious persecution.

In the immigration court, the petitioner testified that, consonant with the Chinese government's repressive population control policies, his wife was fitted with an intrauterine device (IUD) after the birth of their first child.[1] Flouting government policy, she had the IUD removed by a privately retained physician. The couple thereafter conceived a second child. When Chinese authorities became aware of the pregnancy, they subjected the petitioner's wife to a forced abortion in 2005. This event, according to the petitioner, prompted him to leave China and come to the United States.

The Attorney General has discretion to grant asylum to any alien who establishes that he is a refugee. 8 U.S.C. § 1158(b)(1). At the end of the petitioner's hearing, he argued that he was entitled to per se refugee status under 8 U.S.C. § 1101(a)(42)(B) as "a person who has been forced to abort a pregnancy." The IJ rejected this argument, holding that the spouse of a person who has been physically subjected to a forced abortion is not entitled to refugee status per se.

Alternatively, the petitioner argued that he was entitled to asylum on a different ground; he posited that repatriation would

---

[1] We note that the IJ found the petitioner's testimony to be generally credible.

subject him to persecution because his new found Evangelical Christian beliefs would compel him to attend an unsanctioned church (which, in turn, would leave him open to arrest). The IJ rejected this argument as well. She concluded that the evidence in the record indicated that the Chinese government's handling of unsanctioned churches varied widely in different regions of the country, and that the petitioner had not introduced evidence sufficient to show that he was likely to be targeted by the government. Thus, the petitioner had failed to carry his burden of showing a well-founded fear of persecution on account of his religion. See Jiang v. Gonzales, 474 F.3d 25, 30 (1st Cir. 2007).

After the IJ denied the petitioner's application for asylum and ordered his removal, the petitioner appealed. The BIA affirmed. This timely petition for judicial review followed.

In the ordinary course, judicial review in immigration matters focuses on the final order of the BIA. See Amouri v. Holder, 572 F.3d 29, 33 (1st Cir. 2009). But where, as here, the BIA accepts the IJ's findings and reasoning yet adds its own gloss, we review the two decisions as a unit. See Gilca v. Holder, 680 F.3d 109, 114 (1st Cir. 2012).

The main event in this case is the petitioner's claim for per se refugee status under 8 U.S.C. § 1101(a)(42)(B). Because this claim raises a question of statutory interpretation, it engenders de novo review, "albeit with some deference to the

[agency's] reasonable interpretation of the statutes and regulations that fall within its purview." Carvalho-Frois v. Holder, 667 F.3d 69, 72 (1st Cir. 2012).

Section 1101(a)(42)(B) states in pertinent part that the term "refugee" shall include "a person who has been forced to abort a pregnancy or to undergo involuntary sterilization." The petitioner argues that a man whose wife is forced to abort a child loses the child in the same way as the mother and, thus, has been forced to abort a pregnancy. Based on this reasoning, the petitioner asserts that the plain language of the statute encompasses a person — like himself — whose spouse experienced a forced abortion at the hands of the government.

The petitioner's assertion has a certain superficial appeal. But in rebuffing this assertion, both the BIA and the IJ relied on the Attorney General's contrary interpretation of the statute. See Matter of J-S, 24 I&N Dec. 520, 536 (BIA 2008) (opinion of Attorney General). We turn, therefore, to this quandary.

The relevant statute speaks only of "a person who has been forced to abort a pregnancy," 8 U.S.C. § 1101(a)(42)(B). Under a natural reading, the focus is on persons targeted for a procedure, not upon the results of the procedure. Put another way, the statutory language appears unambiguously to refer only to the person who actually undergoes the procedure, not to the spouse of

that person. Two courts of appeals have unreservedly embraced this plain-language construction. See Lin-Zheng v. Att'y Gen., 557 F.3d 147, 157 (3d Cir. 2009); Shi Liang Lin v. U.S. Dep't of Justice, 494 F.3d 296, 309 (2d Cir. 2007). Two others have agreed with the plain-language interpretation, but in an abundance of caution have gone on to discuss the Attorney General's interpretation. See Yi Ni v. Holder, 613 F.3d 415, 425-26 (4th Cir. 2010); Yu v. U.S. Att'y Gen., 568 F.3d 1328, 1332-33 (11th Cir. 2009).

We too hold that the plain language of the statute defeats the petitioner's claim. But even if we assume — favorably to the petitioner — that the statutory text, read charitably, might admit of some conceivable ambiguity, the Attorney General's interpretation would demand the same result.

To begin, 8 C.F.R. § 1003.1(h)(1)(i) authorizes the Attorney General to direct the BIA to refer specific cases to him for review and determination. Given this unfettered grant of authority to usurp the BIA — an authority that the Attorney General exercised in Matter of J-S — the Attorney General's interpretation of the statute is entitled to Chevron deference. See INS v. Aguirre-Aguirre, 526 U.S. 415, 424-25 (1999); Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984); see also Naeem v. Gonzales, 469 F.3d 33, 36 (1st Cir. 2006) (explaining that judicial review of the Attorney General's formal interpretation of an immigration statute is entitled to Chevron

-6-

deference). This means, in effect, that if the statute in question is ambiguous, an inquiring court must defer to the Attorney General's reasonable construction of it. See Chevron, 467 U.S. at 843; Naeem, 469 F.3d at 36.

In Matter of J-S, the Attorney General, relying heavily on a textual analysis of section 1101(a)(42)(B), rejected an expansive interpretation of the statute that would have dictated spousal eligibility. Matter of J-S, 24 I&N Dec. at 528. The Attorney General's interpretation hewed to the letter of the statute. To cinch matters, he fortified this plain-language construction with convincing comparisons to other provisions of the Immigration and Nationality Act. One such provision limns particular circumstances under which a spouse may be eligible for asylum. Id. at 529-30 (citing 8 U.S.C. § 1158(b)(3)). Another requires every applicant for asylum establish "his or her own eligibility." Id. at 530 (emphasis in original) (citing 8 U.S.C. § 1158(b)(1)(B)).

Four of our sister circuits (including two that held the plain language of the statute to be controlling) have addressed the Chevron question that faces us today. They have, without exception, concluded that the Attorney General's interpretation of section 1101(a)(42)(B) is both reasonable and worthy of deference. See Yi Ni, 613 F.3d at 425; Nai Yuan Jiang v. Holder, 611 F.3d 1086, 1097 (9th Cir. 2010); Shou Wei Jin v. Holder, 572 F.3d 392,

397 (7th Cir. 2009); Yu, 568 F.3d at 1332-33.  No court has either rejected the Attorney General's interpretation of the statute or thereafter given its imprimatur to the strained reading that the petitioner espouses.

To be sure, the Attorney General took great care to make certain that his interpretation of section 1101(a)(42)(B) "does not explicitly exclude spouses from its purview."  Matter of J-S, 24 I&N Dec. at 530.  But a spouse must show some special circumstance — that is, something more than his relationship to the recipient of a forced abortion — in order to avail himself of this caveat. Here, however, the petitioner has made no such showing.  Indeed, the agency in this case considered (and found inapplicable) other provisions of section 1101(a)(42)(B) that might have allowed the petitioner to qualify as a per se refugee.  Along these lines, the petitioner could have adduced evidence to show that he had a well-founded fear of, say, forced sterilization or persecution for resisting a coercive population control program.  See 8 U.S.C. § 1101(a)(42)(B).  But the petitioner did not offer any such evidence, nor has he made any such argument.

That ends this aspect of the matter.  We agree with the other courts of appeals that have mulled the question: given the language of the relevant statute and the Attorney General's reasonable interpretation of it, we hold that the agency did not err in refusing to grant the petitioner per se refugee status on

the basis that the Chinese government had compelled his wife to undergo a forced abortion.

We proceed next to the agency's determination that the petitioner did not carry his burden of proving a well-founded fear of religious persecution sufficient to warrant asylum. We review such determinations under the familiar substantial evidence rule. See Ruiz v. Mukasey, 526 F.3d 31, 35 (1st Cir. 2008). "This standard requires us to accept all findings of fact so long as they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Gilca, 680 F.3d at 114 (internal quotation marks omitted); see 8 U.S.C. § 1252(b)(4)(B). "This is not a petitioner-friendly standard of review; a reversal is appropriate only when the record evidence points unerringly to a conclusion different from that reached by the BIA." Ruiz, 526 F.3d at 35 (internal quotation marks omitted); see INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

"An asylum-seeker bears the burden of proving that he is a refugee within the meaning of the immigration laws." Jiang, 474 F.3d at 30. Pursuant to 8 U.S.C. § 1101(a)(42)(A), an alien may achieve refugee status based on a well-founded fear of persecution if "there is a pattern or practice in his or her country of nationality . . . of persecution of a group of persons similarly situated to the applicant on account of . . . religion." 8 C.F.R. § 1208.13(b)(2)(iii)(A).

In this case, the petitioner's evidence suggests that there are important differences between sanctioned and unsanctioned Protestant churches in China. For example, the Chinese government requires sanctioned churches to exalt the Communist Party over God, to instruct members to uphold Marxism, Leninism and Mao Zedong thought, and to withhold baptism for those under the age of 18.[2] The petitioner, who became an Evangelical Christian after he fled from China, maintains in his brief that he regarded these restrictions as inconsistent with the principles of his faith — a circumstance that, upon repatriation, would impel him to join an unsanctioned church.

Here, however, the petitioner's evidence of potential persecution based on this religious choice is neither specific to his own circumstances nor localized to the region in China from which he hails. Such a specific link is normally a necessary element of a claim based on a fear of future persecution. See, e.g., Lopez Perez v. Holder, 587 F.3d 456, 461-62 (1st Cir. 2009); Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir. 2009); Raza v. Gonzales, 484 F.3d 125, 129 (1st Cir. 2007).

At any rate, the petitioner's attempt to establish a pattern and practice of persecution of Evangelical Christians is unpersuasive. His evidence in this respect consists primarily of

---

[2] These directives apparently are anathema to Evangelical Christian churches, and those churches apparently operate in China only as unsanctioned churches.

information about some generalized trends in China, gleaned from a variety of reports published by the State Department and the United States Commission on International Freedom. One of these reports estimates that between fifty and seventy million Chinese Christians practice in unsanctioned churches, even though varying degrees of government-instigated or government-tolerated harassment exist. Another report mentions sporadic incidents of members of unsanctioned churches being incarcerated for "re-education through labor" for engaging in illegal religious activities.

Although these carefully selected evidentiary excerpts hint at a multitude of problems, they are not enough to compel a finding that the petitioner harbors a well-founded fear of religious persecution. The reports to which the petitioner alludes tell us very little about the prevalence or severity of harassment; they tell us even less about the likelihood that the petitioner, if repatriated, would be exposed to harassment that rises to the level of persecution. Cf. Bocova v. Gonzales, 412 F.3d 257, 263 (1st Cir. 2005) (holding that mistreatment rises to the level of persecution when it is "systematic rather than reflective of a series of isolated incidents" and concluding that two instances of police brutality and one threat did not amount to persecution under this standard). We have said before, and today reaffirm, that overview reports, such as the ones upon which the petitioner relies, "do very little to substantiate" claims of persecution as

they do not ordinarily "either directly or by reasonable implication, connect these foibles with the petitioner's particular situation." Lopez Perez, 587 F.3d at 461. "Without some specific, direct, and credible evidence relative to [the petitioner's] own situation," the nexus between the petitioner and the reports' generalized depictions are too speculative to compel a finding of persecution. Seng, 584 F.3d at 19-20.

In all events, the 2008 Department of State Human Rights Report makes manifest that "[l]ocal authorities' handling of unregistered Protestant groups varie[s] in different regions of the country." Relatedly, the report notes that "freedom to participate in religious activities [has] continued to increase in many areas" of China. Thus, the report explains, persecution on this ground is subsiding. The report goes on to explain that "in some regions unregistered groups or house churches with hundreds of members me[e]t openly, with full knowledge of [the] authorities." The documentary evidence relied on by the petitioner concedes the existence of these trends.

To sum up, the evidence, taken as a whole, comprises a mixed bag. The BIA and the IJ were, therefore, free to attach substantial weight to those portions of the evidence that undercut the petitioner's claim. See Negeya v. Gonzales, 417 F.3d 78, 84 (1st Cir. 2005).

The short of it is that the evidence in the record did not compel the agency to find that the petitioner had carried his burden of proving an objectively reasonable and well-founded fear of religious persecution. After all, the petitioner offered no "specific, direct, and credible evidence relative to [his] own situation," Seng, 584 F.3d at 19, as required by our precedents. Given the chiaroscuro nature of the record, the agency's determination that the petitioner failed to carry his burden of establishing that he, in particular, would likely be subject to religious persecution should he be repatriated, is supported by substantial evidence. See, e.g., Chen v. Holder, 675 F.3d 100, 107-08 (1st Cir. 2012).

We add a coda. The petitioner's claim of religious persecution has a peculiar twist: he did not convert to Evangelical Christianity until after his arrival in the United States. Other courts have considered the implications of this cart-before-the-horse scenario and have indicated that it carries with it a need for the alien to prove certain additional facts. See, e.g., Hongsheng Leng v. Mukasey, 528 F.3d 135, 138 (2d Cir. 2008) ("[T]o establish eligibility for relief based exclusively on activities undertaken after his arrival in the United States, an alien must make some showing that authorities in his country of nationality are (1) aware of his activities or (2) likely to become aware of his activities."); Sui Jing Zhang v. Att'y Gen., ___ Fed. App'x

___, ___ (3d Cir. 2012) [No. 12-1510, slip op. at 3] (similar).  We take no view on this issue because, in all events, the petitioner's claim of religious persecution fails on other grounds.

We need go no further.[3]  For the reasons elucidated above, we deny the petition for judicial review.

**So Ordered**.

---

[3] The petitioner's argument that the BIA gave insufficient consideration to the distinction between sanctioned and unsanctioned churches does not alter this conclusion.  This distinction is irrelevant to the question of whether the petitioner forged a nexus between whatever generalized problems existed and his own situation.