# United States Court of Appeals
## For the First Circuit

No. 15-1789

JINAN CHEN,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, Lipez, and Thompson,
<u>Circuit Judges</u>.

<u>Michael Brown</u> on brief for petitioner.
<u>Matthew A. Connelly</u>, Trial Attorney, Office of Immigration Litigation, Civil Division, Department of Justice, <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, Civil Division, and <u>Edward E. Wiggers</u>, Senior Litigation Counsel, Office of Immigration Litigation, on brief for respondent.

February 24, 2016

**THOMPSON**, **Circuit Judge**. Petitioner Jinan Chen ("Chen"), a native and citizen of the People's Republic of China ("China"), seeks judicial review of a final order of removal issued by the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's ("IJ's") denial of Chen's application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). For the reasons articulated below, we deny Chen's petition for review.

## I.   Background

Chen entered the United States without inspection in December 2009 and was detained shortly after entry. On January 14, 2010, Chen was issued a Notice to Appear. In a hearing before an IJ on January 27, 2010, Chen, through counsel, conceded removability but sought asylum, withholding of removal, and protection under CAT.

In his subsequent asylum application, Chen stated that he fled China to avoid persecution by the country's family planning officials and that he feared being subjected to forced sterilization if he were to return. Chen further indicated that after his arrival in the United States -- and after his removal proceedings had already begun -- he joined the China Democracy Party ("CDP"), which, Chen explained, is seen "as a reactionary political party by the Chinese government." As a result, Chen

stated that he also feared future persecution due to his CDP membership.

In support of his application, Chen testified before a different IJ on October 25, 2013. At the hearing, Chen explained that while living in China he got married in a traditional wedding ceremony, held in accordance with "Chinese cultur[al] tradition[]." But because his wife had not yet reached China's legal marital age of 21 (she was 19 at the time) they did not receive a marriage certificate. So, according to Chen, when his wife then got pregnant it was considered a violation of China's family planning regulations because they were not legally married.

Chen told the IJ that, on July 18, 2009, local government officials came to his home[1] looking for his wife, who, Chen claimed, would have been forced to undergo an abortion. Fortunately, his wife was not at home. Chen testified, however, that when he refused to tell the officials his wife's whereabouts he was beaten and subsequently taken to the police station where he was placed in custody, interrogated, further assaulted, and threatened with forced sterilization. Chen explained that he was released from police custody on July 27, 2009 -- nine days later -- after his father paid "a lot of money to the police station" and after Chen

---

[1] From review of the record, it appears that Chen lived in a small village -- Lantian Village -- in Changle City, Fujian Province where he was born and where his father still resides.

promised to go find his "girlfriend" and ask her to get an abortion. Instead, Chen's wife escaped to Sichuan Province and hid with family while Chen fled to Beijing, by way of Guangzhou, before leaving China altogether in October of 2009.

Describing the injuries he received during his detention, Chen explained that he was covered in bruises but he admitted that he did not go to the hospital for treatment, relying instead on traditional herbal medications. Chen further admitted that after he left his village (in August of 2009) he was not harassed by government officials in Guangzhou or Beijing prior to his departure from China in October of that year. But he claimed that the local family planning officials were still looking for him and had visited his old house once, "around July." Since arriving in the United States, Chen claims to have lost touch with his wife and her entire family. He does not know if he has a child.

In addition to Chen's concerns about China's family planning authorities, Chen also testified that he feared persecution in China due to his membership in the CDP, which the Chinese government considers to be an "anti-government" organization that is trying "to overthrow the government." Chen explained that after moving to the United States he became involved in the organization -- taking classes, attending demonstrations, and even writing several articles for the CDP website

- 4 -

(approximately four articles over the course of three years). Chen testified, though, that the Chinese government actively monitors CDP activities and claimed that representatives of the Chinese government had, in fact, visited his parents in China to tell them that Chen must cease his CDP activities or face imprisonment. Despite these visits from the authorities, Chen acknowledged that the Chinese government has never harmed any of his family members who remain in China.

At the hearing, an assistant director from the CDP in New York also testified in support of Chen. The director disclosed that Chen was an active member of the CDP, participating in CDP study classes and attending demonstrations in front of the Chinese consulate. Although the director confirmed that Chen had written articles for the CDP's website, he also divulged that most of the CDP's over 2,000 members have posted articles on the website and that the website boasts thousands of articles. Still, he stated that the Chinese government actively monitors the organization's activities, sometimes by hacking into the group's website, and that he knew at least one CDP member who was arrested after the member was forced to return to China.

In an oral opinion issued the same day as the hearing, the IJ denied Chen's application for asylum, withholding of removal, and protection under CAT. With respect to Chen's first claim, the IJ concluded that Chen had failed to carry his burden

to show either past persecution or a well-founded fear of future persecution due to his violation of China's family planning regulations, noting that Chen had presented no concrete evidence that his wife even existed. Specifically, the IJ mentioned Chen's failure to produce a single picture of his wife or of the wedding ceremony. The IJ was also somewhat incredulous that Chen did not know where his wife was, whether the family planning officials were still looking for her, or even whether she had his child. The IJ further concluded that even if Chen had provided corroborating evidence of his wife's existence,[2] his testimony with respect to his persecution by the family planning officials was not credible, calling, for example, Chen's testimony that the family planning officials "left it up to him" to find his wife "unbelievable."

But in the end, the IJ determined that, even assuming the truth of Chen's testimony, his treatment did not rise to the level of past persecution. The IJ noted that Chen did not need to see a doctor after his detention, was successfully able to travel to, and live in, Beijing without being harassed, and was allowed to leave the country using his own passport. As a result, the IJ

---

[2] The IJ acknowledged, but disregarded, a letter from Chen's father, who still resides in China, submitted in support of his application. Although the letter confirmed Chen's version of events, including the existence of Chen's wife, the IJ determined that it was of limited value because Chen's father was an "interested witness who was not subject to cross-examination."

also found that Chen had not established a well-founded fear of future persecution since he "certainly could return to Beijing, which is a city of millions of people several hours away from his home" and where "the local family planning officials do not have jurisdiction."

Regarding Chen's second claim, the IJ determined that Chen had failed to demonstrate a well-founded fear of future persecution based on his membership in the CDP. According to the IJ, Chen had failed to offer any credible evidence that the Chinese government was aware, or was likely to become aware, of his involvement in the CDP. Noting that Chen was "merely a member" of the CDP, not an officer or director, the IJ doubted that the Chinese government was likely to search for, or find, Chen's name among the thousands of articles that are posted on the CDP's website. Moreover, the IJ stated that he "expressly disbelieve[d]" Chen's father, who had submitted a letter indicating that the Chinese government had come looking for Chen at the father's house in China because of Chen's membership in the CDP. And finally, the IJ concluded that Chen had not established that it was more likely than not that he would be tortured upon his return to China.

Chen appealed to the BIA on November 14, 2013, arguing that he had adequately established eligibility for asylum or, in the alternative, withholding of removal and protection under CAT. In particular, Chen argued that the IJ erred in concluding that

Chen's past treatment did not rise to the level of past persecution under the law and that Chen had not established a well-founded fear of future persecution based on his membership in the CDP.

The BIA rejected Chen's appeal and affirmed the IJ's decision. Concurring with the IJ, the BIA concluded that Chen had not established past persecution based on his violation of China's family planning policy or "shown that the punishment he received from Chinese authorities, even when viewed cumulatively, rose to the level of persecution." In addition, the BIA concluded that Chen had not "established a well-founded fear of persecution in China based on his membership and participation in the [CDP]." Chen timely filed this petition for judicial review.

## II. Analysis

Before us, Chen argues that the BIA erred in finding that he had failed to establish (1) past persecution due to his violation of China's family planning laws and (2) a well-founded fear of future persecution due to his membership in the CDP.[3]

This court typically reviews the final decision of the BIA, but when "the BIA accepts the IJ's findings and reasoning yet adds its own gloss, we review the two decisions as a unit." Moreno v. Holder, 749 F.3d 40, 43 (1st Cir. 2014) (quoting Xian Tong Dong v. Holder, 696 F.3d 121, 123 (1st Cir. 2012)). We review agency

_____

[3] Chen does not make any arguments in support of his CAT application.

findings of fact under the familiar substantial evidence standard. Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008). "This is not a petitioner-friendly standard of review." Xian Tong Dong, 696 F.3d at 125. Under this deferential standard, we must accept all findings of fact "as long as those findings are supported by reasonable, substantial, and probative evidence on the record considered as a whole," and will reverse only if the evidence compels a contrary determination. Chhay, 540 F.3d at 5 (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992)).

To establish eligibility for asylum, Chen "must demonstrate a well-founded fear of persecution on one of five protected grounds -- race, religion, nationality, political opinion or membership in a particular social group." Paiz-Morales v. Lynch, 795 F.3d 238, 243 (1st Cir. 2015) (quoting Singh v. Holder, 750 F.3d 84, 86 (1st Cir. 2014)). He "can meet this burden through proof of past persecution, which creates a rebuttable presumption of a well-founded fear of future persecution" or by demonstrating "a well-founded fear of persecution through an offer of specific proof that his fear is both subjectively genuine and objectively reasonable." Singh, 750 F.3d at 86. Unlike the higher standard for withholding of removal, "to qualify for asylum [Chen] is not required to prove that it is more likely than not that he will be persecuted." Ravindran v. I.N.S., 976 F.2d 754, 758 (1st Cir. 1992).

Here, Chen first argues that the BIA erred in finding that his treatment at the hands of the family planning authorities did not rise to the level of past persecution. Although acknowledging that a finding of persecution requires more than harassment or unfair treatment, Chen maintains that his arrest and assault "far exceeded hollow threats" and was severe enough to rise to the level of persecution. In addition, Chen seems to suggest that "[t]he length of [his] detainment itself" -- nine days -- necessarily rises to the level of persecution. After careful review of the record, however, we find substantial evidence to support the agency's decision.

Persecution requires more than "unpleasantness, harassment, and even basic suffering." Nelson v. I.N.S., 232 F.3d 258, 263 (1st Cir. 2000). And "[a]n individual seeking asylum 'bears a heavy burden,' and faces a 'daunting task' in establishing subjection to past persecution." Vasili v. Holder, 732 F.3d 83, 89 (1st Cir. 2013) (quoting Alibeaj v. Gonzales, 469 F.3d 188, 191 (1st Cir. 2006)). Accepting the facts as presented by Chen, the record indicates that over a period of nine days he was detained, threatened, and subjected to physical abuse. But a single detention, even one accompanied by beatings and threats (and we certainly do not want to minimize Chen's treatment at the hands of the family planning authorities), does not necessarily rise to the level of persecution. See, e.g., Topalli v. Gonzales, 417 F.3d

128, 132 (1st Cir. 2005) (concluding that seven arrests and brief detentions coupled with beatings over a two-year period did not amount to persecution).  This is especially true where, as here, Chen was released from custody, was able to travel freely in and around the country without being harassed, and was allowed to leave the country using his own passport.  See Decky v. Holder, 587 F.3d 104, 111 (1st Cir. 2009) (finding no persecution where the evidence supported the conclusion that the beating was an isolated event and there was no evidence of systematic mistreatment).

Furthermore, although Chen's ordeal included repeated beatings during his detention, his injuries did not exceed bruising and did not require hospitalization or conventional, allopathic medical care.  Instead, Chen was able to adequately treat his injuries by relying on traditional herbal medicines.  Without discounting the effectiveness of herbal treatments (or turning "the presence or absence of injury requiring medical attention into a sort of 'acid test' for persecution," Topalli, 417 F.3d at 132), we recognize that the fact that Chen did not require hospitalization bears on the "nature and extent" of his injuries and is certainly "relevant to the ultimate determination." Vasili, 732 F.3d at 89.

Next, Chen argues that the agency erred in concluding that he had not established a well-founded fear of persecution based on his CDP membership.  In essence, Chen contends that he

presented sufficient evidence -- his father's letter stating that government officials had visited his house in China due to Chen's CDP activities, photographs of Chen attending CDP events in the United States, and a 2012 Department of State Country Report confirming that the Chinese government monitors and imprisons CDP members -- to establish a well-founded fear of persecution. But the IJ and the BIA were justified in concluding that Chen had not provided "reasonable, substantial, and probative evidence," Xian Tong Dong, 696 F.3d at 125 (citation omitted), that the Chinese government was actually aware of, or was likely to become aware of, his CDP activities.

Chen was not an officer or a director in the CDP and, although he had attended rallies and classes, his only concrete links to the organization were a few pro-CDP articles posted on the group's website -- a website that boasts thousands upon thousands of similar writings. And although the letter submitted by Chen's father does suggest that the Chinese government is aware of Chen's CDP activities, the agency was entitled to conclude that, absent substantiation, this statement, which was made by an interested witness not subject to cross examination,[4] was entitled to limited weight, see Yong Xiu Lin v. Holder, 754 F.3d 9, 15 (1st

_____

[4] Although here we defer to the agency's determination of the weight afforded Chen's father's letter, we do not mean to suggest that all interested witness statements not subject to cross examination should necessarily be given limited weight.

- 12 -

Cir. 2014), especially here, where the IJ had expressly stated that he did not believe Chen's father's statement.  As for Chen's remaining proffer, the 2012 Department of State Country Report, "[w]ithout some specific, direct, and credible evidence relative to [Chen's] own situation, the nexus between [Chen] and the report['s] generalized depictions are too speculative to compel a finding of persecution."  Xian Tong Dong, 696 F.3d at 126-27 (quoting Seng v. Holder, 584 F.3d 13, 19-20 (1st Cir. 2009)).

In sum, nothing in the record compels us to find that the agency erred in concluding that Chen failed to carry his burden to demonstrate either past persecution or an objectively reasonable and well-founded fear of future persecution.  And "[b]ecause [Chen] has failed to meet the more forgiving asylum standard, he necessarily cannot meet the higher standard for withholding of removal."  Attia v. Gonzales, 477 F.3d 21, 24 (1st Cir. 2007)(per curiam).

The petition for review is denied.