# United States Court of Appeals

## For the First Circuit

No. 14-1995

YORDANOS ARAYA BAHTA,

Petitioner,

v.

LORETTA E. LYNCH,
Attorney General of the United States,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Thompson, Selya, and Lipez
Circuit Judges.

Derege B. Demissie and Demissie & Church on brief for petitioner.

Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, John S. Hogan, Assistant Director, Office of Immigration Litigation, and Andrea N. Gevas, Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice, on brief for respondent.

August 24, 2016

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Loretta E. Lynch has been substituted for former Attorney General Eric H. Holder, Jr., as the respondent.

**LIPEZ**, <u>**Circuit Judge**</u>.  Petitioner Yordanos Araya Bahta, a native and citizen of Eritrea, seeks review of a final order of the Board of Immigration Appeals ("BIA") denying her application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").  An immigration judge ("IJ") ordered Bahta's removal to her homeland after concluding that Bahta failed to remedy credibility problems in her testimony with persuasive corroborating evidence.  The BIA affirmed this decision.  Bahta asserts that the IJ and BIA erred, inter alia, in holding that her application was not adequately supported and relying on evidence outside the record.  Finding these contentions unavailing, we deny the petition for review.

## I.

On February 11, 2009, Bahta entered the United States on a nonimmigrant visa.  She was authorized to remain in the country until May 10, but stayed beyond that date.  In October 2009, Bahta filed an application for asylum, withholding of removal, and protection under the CAT, claiming that she was persecuted in Eritrea because of her Pentecostal faith.[1]  In March 2010, Bahta was served with a Notice to Appear charging her with removability

---

[1] Bahta's application also asserted membership in a particular social group as a basis for relief, but the IJ deemed that ground "not cognizable" because Bahta did not specify the particular group to which she belonged.  Bahta does not address the social group variation of her claim in her petition for review, and we therefore deem it waived.

as an alien present in the United States beyond the time authorized. See 8 U.S.C. § 1227(a)(1)(B). She conceded removability, and a merits hearing was held in February 2013 on her petition for relief. Bahta was the only witness, and she provided the following account of her religious persecution.[2]

In 1997, while Bahta was serving in the Eritrean military, a friend, Rosina Hadush, introduced her to the Pentecostal religion. Bahta converted and, in 1998, became a member of the Emmanuel Pentecostal Church in Asmara, the city where she lived. Bahta reported that members of the army were not allowed to follow the Pentecostal religion because the Eritrean government objected to it. Her superior officer reprimanded her for reading the Bible during her breaks, told her to stop doing so, and ordered her to attend Orthodox Church services. In her affidavit, Bahta states that the officer warned her that "it would be his duty to arrest me or otherwise punish me if he saw me again reading the bible or heard me invite anyone to come to church with me."

After Bahta left the military in 2002, her continued

--------

[2] Bahta's testimony repeated in abbreviated form the more detailed account of her experiences presented in an eleven-page affidavit submitted with her asylum application. Among other information, the affidavit included observations about the Eritrean government's hostility toward religions other than "the officially sanctioned Orthodox or Catholic churches" and describes the government's particular opposition to the Pentecostal Church.

3

participation in the Pentecostal Church led to two arrests. In 2003, she and others attending a prayer session at her friend's home were arrested and taken to the police station, where she and ten to fifteen persons, including other Pentecostals, were held in a small, metal cargo container for seven days. They were given only bread to eat and were allowed out of the container twice a day to use the restroom. Upon her release, Bahta was told that if she continued practicing her religion, she would be taken to the battlefront and killed. She thereafter practiced her religion in secret at her friend's house.

In 2008, Bahta again was arrested, this time while delivering food and clothing to an imprisoned Pentecostal pastor, and detained for two days along with four other people. As a condition of release, she was ordered to report monthly to the police station. Shortly after this second arrest, Bahta's aunt, who lives in Saudi Arabia, secured a worker visa that enabled Bahta to go there and obtain a job as a babysitter.

In February 2009, Bahta accompanied her employers to the United States on a tourist visa that the employers arranged for her, traveling from Saudi Arabia to Washington, D.C. In her affidavit, Bahta stated that she attended church while in Washington and, for the first time in years, "prayed without looking over my shoulders in fear of being arrested." She became concerned about returning to Saudi Arabia and, on the advice of an

4

Ethiopian woman whom she met at the hotel, called a distant relative in Boston who urged her to travel to that city by bus. In early March, roughly two weeks after Bahta arrived in Washington, the Ethiopian woman took Bahta to the bus. Although Bahta asked her employers for her passport before she traveled, they refused to give it to her until she returned with them to Saudi Arabia. In Boston, she regularly attended the Ethiopian Evangelical Church, which she described as the local branch of the Pentecostal Church of Ethiopia.

Bahta's testimony was supplemented by various documents: the asylum application itself, with its accompanying affidavit; a photocopy of her United States visa showing her employment as a "personal or domestic employee" of the Saudi family; country conditions reports and articles describing the treatment of religious minorities in Eritrea; hand-dated photographs of her family in Eritrea; translated letters from her mother and the friend whom Bahta said had influenced her to convert to the Pentecostal religion; and a letter from the pastor of her Boston church.

In an oral ruling announced at the conclusion of the merits hearing, the IJ expressed "serious doubts" about Bahta's credibility and highlighted two discrepancies arising from Bahta's testimony. First, Bahta's asylum application stated that she entered the United States in Boston, although she testified that

5

she came with her Saudi employers to Washington, D.C., and later traveled to Boston.[3] The IJ also questioned the timing of Bahta's move from Eritrea to Saudi Arabia, reviewing, in detail, an exchange that took place between Bahta and the representative of the Department of Homeland Security ("DHS") during cross-examination. Bahta was asked if the visa application completed by her employers stated that she had been their babysitter in Saudi Arabia for five years -- timing that would have overlapped with her reported arrest in Eritrea in 2008. Bahta responded, "That might be true, because they did everything." After stating that Bahta's explanation for the discrepancy "was not clear to the Court," the IJ went on to note that "the respondent did not emphatically deny that she had worked for this family in Saudi Arabia for five years."

Although the IJ refrained from making an explicit adverse credibility finding regarding Bahta's testimony, the judge examined whether Bahta's supporting documents provided "corroborating, objective, credible evidence to rehabilitate [her] testimony," and concluded that the submissions fell short. The IJ stated that Bahta "offered no proof other than her own self-serving testimony that she was in Eritrea between 2004 and 2009[,] . . . and specifically in 2008 when she is alleged to have been

_____

[3] Her affidavit, however, detailed her arrival in Washington and subsequent travel to Boston.

6

arrested for the second time." The IJ discounted the family photographs as evidence of Bahta's presence in Eritrea at the relevant time because there was no foundation provided for the handwritten dates on them.

Further, the IJ noted that Bahta had not provided "any credible objective evidence that she actually was a member of the Pentecostal Church in Eritrea." Acknowledging Bahta's testimony that she could not get letters from the church because it had been closed by the government, the IJ questioned Bahta's failure "to obtain letters from any individuals or the testimony of any witnesses." The IJ also noted the absence of testimony or a letter from the relative in Boston whom Bahta said she contacted after she arrived in Washington. As for the country conditions reports, the IJ stated that "none of them mention the targeting of Pentecostals by the government for persecution."[4] The IJ thus concluded that Bahta had not met her burden to prove eligibility for any form of relief from removal.

Bahta appealed to the BIA. In an opinion that expressly adopted and affirmed the IJ's conclusion, the BIA addressed in

---

[4] The IJ recognized that "Eritrea is not a bastion of religious freedom," but found that Bahta had not "met her burden of proof that she would be targeted by the government if she returned to Eritrea in 2013." The IJ also viewed the country conditions reports as not controlling "[i]n any event, because the respondent has not even established to the satisfaction of the Court that she is in fact a Pentecostal."

7

some detail Bahta's evidence and her claims of error by the IJ. The Board challenged Bahta's assertion that the inconsistency concerning her arrival city was the product of "a simple clerical mistake," noting that -- contrary to her testimony -- her asylum application "clearly indicates she arrived in Boston" and that she "swore that the contents of her asylum application were true." The BIA also rebuffed Bahta's complaint that the DHS improperly relied on her visa application, which was not in the record, to ask about the duration of her employment in Saudi Arabia. The Board observed that Bahta bore the burden of proof in the proceedings, but had produced no corroborating evidence concerning the length of her employment.

The BIA thus upheld the IJ's determination that Bahta "did not provide or adequately explain her failure to produce corroborative evidence," and concluded that, "[i]n the absence of adequate testimony and documentary support, the respondent cannot establish her eligibility for asylum or withholding of removal." The BIA also agreed that Bahta was not eligible for CAT relief. Accordingly, her appeal was dismissed.

Bahta timely filed a petition for review in this court, arguing that the decisions of the IJ and BIA were not supported by the record. In particular, Bahta asserts that the agency adjudicators erroneously found material inconsistencies in the evidence she presented and violated her due process rights by

8

considering her visa application.

II.

## A. Standard of Review

When the BIA adopts and affirms the findings of the IJ, and also engages in its own discussion of the rationales supporting the IJ's determination, we review both the BIA's and IJ's decisions. Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014); see also Xian Tong Dong v. Holder, 696 F.3d 121, 123 (1st Cir. 2012) ("[W]here, as here, the BIA accepts the IJ's findings and reasoning yet adds its own gloss, we review the two decisions as a unit."). Our role is to determine whether the agency's ruling is supported by substantial evidence in the record. See Ordonez-Quino, 760 F.3d at 87; Ivanov v. Holder, 736 F.3d 5, 11 (1st Cir. 2013). Under that deferential standard, "barring an error of law, we reverse 'only if the record is such as to compel a reasonable factfinder to reach a contrary determination.'" Vasili v. Holder, 732 F.3d 83, 89 (1st Cir. 2013) (quoting Chhay v. Mukasey, 540 F.3d 1, 5 (1st Cir. 2008)); see also 8 U.S.C. § 1252(b)(4)(B).

## B. Asylum

An applicant for asylum must demonstrate that she is a refugee, which requires a showing of either past persecution or a well-founded fear of future persecution based on one of five statutory grounds. See Sunarto Ang v. Holder, 723 F.3d 6, 10 (1st Cir. 2013); 8 U.S.C. § 1101(a)(42)(A) (identifying the five grounds

9

supporting refugee status as race, religion, nationality, membership in a particular social group, and political opinion); 8 C.F.R. § 1208.13(b). Proof of past persecution creates a rebuttable presumption of future persecution, Sunarto Ang, 723 F.3d at 10, and absent such proof, a petitioner is "eligible for asylum only if [she] can show that [her] fear of future persecution is both subjectively genuine and objectively reasonable," id. at 12.

After carefully reviewing the record in light of Bahta's burden to demonstrate eligibility for asylum, we cannot conclude that a reasonable factfinder would be compelled on this record to reach a different conclusion. Bahta's claim to asylum rests on her assertion that she was persecuted in Eritrea for practicing the Pentecostal religion, with the mistreatment including an arrest in 2008 that prompted her departure from her homeland. Although the BIA (following the IJ's lead) did not reject Bahta's claim out-of-hand, it concluded that her "testimony without sufficient documentary support is insufficient to meet her burden of proof." It then considered whether Bahta had produced adequate documentary evidence to corroborate her story -- an inquiry expressly authorized by statute. See 8 U.S.C. § 1158(b)(1)(B)(ii) (requiring an asylum applicant to provide such evidence unless it

"cannot reasonably [be] obtain[ed])[5]; see also Guta-Tolossa v. Holder, 674 F.3d 57, 62 (1st Cir. 2012) ("[A]n IJ can require corroboration whether or not she makes an explicit credibility finding . . . .").

The BIA determined that, even in combination, "[t]he respondent's testimony, of limited credibility, and her corroborative evidence . . . does not satisfy her burdens of proof." The record permits that judgment. Bahta provided no concrete support for her claim that she was in Eritrea in 2008, a member of the Pentecostal Church there, or arrested for her religious activity. The letter from her friend (the one whom Bahta said influenced her to become a Pentecostal) stated that Bahta had participated in the Eritrean Pentecostal Church, but the letter left the timeframe for Bahta's membership in that church

---

[5] Section 1158(b)(1)(B)(ii) provides, in pertinent part:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. . . . Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

11

murky.[6]  Likewise, the letter from Bahta's mother did not provide critical corroborative details.  Although it reports (as translated) that Bahta's friends from school and church "who are not lucky to leave the country are still in prison," and refers to the "horror and mistreatment of those captured while cland[estine]ly performing religious activity," it does not mention Bahta's own arrests or her departure for Saudi Arabia.

Nor can we conclude that the agency acted unjustifiably in expecting more persuasive corroborating evidence.  For instance, it stands to reason that, despite the closure of her church, Bahta could have obtained a written statement from one or more of the individuals allegedly arrested along with her at the prayer service in 2003, or from someone among the ten to fifteen others allegedly held with her for a week in the cargo container.  Similarly, even if Bahta could not procure an official record documenting her second arrest in 2008, the agency reasonably could expect a statement from the aunt who arranged for Bahta's move to Saudi Arabia shortly thereafter, which could have reinforced both the claimed reason for, and timing of, her move.

Submission of evidence that should have been readily

---

[6] In full, the unsigned, translated letter, dated January 21, 2010, stated: "I, Rosina Hadush, have been residing in Riyaddh Saudi Arabia, swear in the name of Jesus Chirist[sic] that, I knaw[sic] Yordanos Bahta for many years since been in our country, Eritrea and praudly[sic] been staunch fellowers[sic] and members of the Eritrean Penecostechurch[sic]."

12

obtainable also would have bolstered Bahta's veracity more generally. To give one example, testimony by the Boston relative about Bahta's telephone call describing her situation in Washington would have corroborated Bahta's claim that her asylum application simply contained a mistake in identifying Boston as her arrival city. Such testimony might have included details that also could have strengthened a significant element of her story -- that her employers had possession of her passport -- and thus diminish the plausible inference that Bahta had not produced her passport only because its contents would **undercut** her claims.[7] See Matter of J-Y-C, 24 I. & N. Dec. 260, 263 (BIA 2007) (stating that "an asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification . . . . The absence of such corroborating evidence can lead to a finding that an applicant has failed to meet [his] burden of proof." (quoting Matter of S-M-J, 21 I. & N. Dec. 722, 725-26 (BIA 1997)) (omission and alteration in original)).

---

[7] In her affidavit, Bahta speculated that her employers decided to keep her passport after she told them about her positive experience in church because they "realiz[ed] that I would wish to live in a country where being a Christian was not considered illegal." Given that reaction, Bahta said she became frightened by the prospect of returning to Saudi Arabia because her "freedom and safety would depend entirely on [her employers'] goodwill and whim." She then sought advice from the Ethiopian woman, which led to contact with the relative in Boston.

13

Bahta attempts to undermine the IJ and BIA decisions by challenging the agency's reliance on her visa application. As described above, the DHS representative at the merits hearing stated, in effect, that Bahta's visa application said she had worked for the Saudi family for five years -- a length of time inconsistent with her report that she was arrested in Eritrea in 2008.[8] Neither party introduced the application into the record and, upon questioning by the IJ, the agency representative said he was unable to produce the document.[9]

Without doubt, the agency should not have used the application at the hearing if no party could produce the document. Indeed, as the BIA acknowledged, "the Immigration Judge's decision must be based on the evidence before him," and, in this instance, the IJ admitted that "[t]he Court . . . does not have any documentation that [the five-year] representation was made in the visa application." However, the IJ's "serious doubts" about Bahta's credibility, even with respect to her employment in Saudi Arabia, did not rest solely (or even largely) on the suggested

_____

[8] As described above, Bahta said she moved to Saudi Arabia with the worker's visa secured by her aunt shortly after her 2008 arrest. A five-year employment with the Saudi family would mean that she began working for them no later than 2004.

[9] The representative stated that the information concerning the duration of Bahta's employment came from "Government records," but added that he did not "have the ability to submit [the records] to the Court."

14

conflict between Bahta's visa application and her sworn statements that she was arrested in 2008.[10]  With respect to Bahta's timing in Saudi Arabia, the IJ pointed to "[t]he entire series of questions and the respondent's answers," including her testimony that she did not have her passport, "which could clarify whether [she] actually had been in Eritrea in 2008."  The IJ seemed skeptical of Bahta's explanation that her employers refused to return the passport.

We emphasize, moreover, that Bahta bore the burden to substantiate the facts underlying her asylum claim.  As described above, the IJ noted the absence of "credible, objective evidence that she was living in Eritrea between 2004 and 2009, and specifically in 2008 when she is alleged to have been arrested for the second time."  The BIA reiterated that deficiency, observing that Bahta "ha[d] submitted no corroborating evidence concerning her employment or her time in Eritrea."

In sum, we cannot say, on this record, that a reasonable factfinder would be compelled to conclude that Bahta met her burden to prove past persecution.[11]  Bahta's argument that she nonetheless

---

[10] Bahta contends that the IJ misapprehended her testimony about the visa application by construing it as an admission that the five-year timeframe might be correct.  The BIA, however, and arguably the IJ as well, understood her to say only that "it might be true that her employers made such a claim" when they completed the application on her behalf. (Emphasis added.)

[11] We also reject Bahta's due process claim based on the government's use of the visa application.  Without condoning DHS

showed a well-founded fear of <u>future</u> persecution rests primarily on the erroneous premise that she is entitled to the rebuttable presumption arising from a showing of past persecution, rather than on the necessary "'specific proof' that . . . her fear of future persecution 'is both subjectively genuine and objectively reasonable.'" <u>Guaman-Loja</u> v. <u>Holder</u>, 707 F.3d 119, 122 (1st Cir. 2013) (quoting <u>Decky</u> v. <u>Holder</u>, 587 F.3d 104, 110 (1st Cir. 2009)). Having sustained the IJ and BIA's determination that Bahta is not entitled to the presumption, we also uphold their judgment that she has not made the requisite "independent showing" of future persecution. <u>Gilca</u> v. <u>Holder</u>, 680 F.3d 109, 116 (1st Cir. 2012); see <u>Moreno</u> v. <u>Holder</u>, 749 F.3d 40, 45 (1st Cir. 2014) (observing

---

reliance on such an extra-record document, we note that the challenged information consisted of personal details of which Bahta would have knowledge. She thus had the opportunity at the hearing and before the BIA to correct any inaccuracies, which was sufficient to meet the constitutional standard for this context. <u>See</u> <u>Muñoz-Monsalve</u> v. <u>Mukasey</u>, 551 F.3d 1, 6 (1st Cir. 2008) (stating that, in asylum proceedings, "fundamental fairness means in general terms that the alien must have a meaningful opportunity to present evidence and be heard by an impartial judge"); <u>cf.</u> <u>Gebremichael</u> v. <u>INS</u>, 10 F.3d 28, 38-39 (1st Cir. 1993) (concluding that "the motion to reopen process can ordinarily satisfy the demands of due process" when the BIA relies on extra-record facts concerning changed country conditions).

Bahta addressed the discrepancy, however, only by reiterating her story. When asked during cross-examination how she could have been arrested in February 2008 if she was by then babysitting in Saudi Arabia, she responded, "I was arrested in Eritrea," and said the proof of her presence in Eritrea was the "[t]hings I have submitted." Her attorney declined to conduct redirect. Before the BIA, Bahta pointed to "the record, including [her] testimony and affidavit," as proof that she moved to Saudi Arabia in 2008.

16

that petitioner's argument regarding future persecution, dependent on the rebuttable presumption, "collapses of its own weight" because "petitioner did not succeed in proving past persecution").[12]

## C. Other Forms of Relief

The showing required to qualify for withholding of removal -- "a clear probability of persecution" -- "imposes 'a more stringent burden of proof on an alien than does a counterpart claim for asylum.'" Ang v. Gonzales, 430 F.3d 50, 58 (1st Cir. 2005) (quoting Rodriguez-Ramirez v. Ashcroft, 398 F.3d 120, 123 (1st Cir. 2005)). Accordingly, Bahta's claim for withholding of removal necessarily fails along with her asylum claim. See id.

Although Bahta also applied for relief under the CAT, she makes only passing reference to that claim on appeal and it is therefore waived. See Nikijuluw v. Gonzales, 427 F.3d 115, 120 n.3 (1st Cir. 2005).

Having rejected each of Bahta's claims, we deny her petition for review. So ordered.

---

[12] Given that the IJ supportably rejected Bahta's asylum claim because she "has not even established to the satisfaction of the Court that she is in fact a Pentecostal," we need not, and therefore do not, address whether the country conditions reports that she submitted show that the Eritrean government persecutes Pentecostals or, indeed, whether the type of mistreatment Bahta claims to have experienced in Eritrea amounted to persecution.

17